# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2000-DP-00727-SCT

*ALAN MICHAEL RUBENSTEIN*

*v.*

*STATE OF MISSISSIPPI*

## ON MOTION FOR REHEARING

| | |
|---|---|
| DATE OF JUDGMENT: | 02/05/2000 |
| TRIAL JUDGE: | HON. KEITH STARRETT |
| COURT FROM WHICH APPEALED: | PIKE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | ELIZABETH JANE HICKS |
| | DAVID PAUL VOISIN |
| | JAMES E. SHIELDS, SR. |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JUDY T. MARTIN |
| | MARVIN L. WHITE, JR. |
| DISTRICT ATTORNEY: | DEWITT (DEE) BATES, JR. |
| NATURE OF THE CASE: | CRIMINAL - DEATH PENALTY - DIRECT APPEAL |
| DISPOSITION: | AFFIRMED IN PART; REVERSED IN PART AND REMANDED FOR RESENTENCING - 08/10/2006 |
| MOTION FOR REHEARING FILED: | 01/12/2006 |
| MANDATE ISSUED: | |

**EN BANC.**

**DICKINSON, JUSTICE, FOR THE COURT:**

¶1.     The appellant's motion for rehearing is granted. The previous opinions are withdrawn, and these opinions are substituted therefor.

¶2.     This is a capital murder case in which the jury, unaware of its option to sentence the defendant to life without the possibility of parole, sentenced the defendant to death.

## BACKGROUND FACTS AND PROCEEDINGS

¶3. Alan Michael Rubenstein ("Rubenstein"), a Louisiana resident, owned a cabin in Summit, Mississippi, which he used as a weekend home. On December 16, 1993, Rubenstein's step-son, Darrell Perry ("Darrell"),[1] Darrell's wife, Evelyn Anne Loque ("Annie"),[2] and their four-year-old daughter, Krystal Perry ("Krystal"),[3] were found murdered in the cabin.

¶4. On November 5 or 6, 1993, Rubenstein drove Annie, Darrell, and Krystal ("the Perrys") from New Orleans to the cabin in Mississippi and left them there without a vehicle. Annie's mother, Zula Loque ("Loque"), grew concerned after several weeks passed without hearing from the Perrys. Sometime after Thanksgiving, she asked Rubenstein if he had checked on the Perrys, and she requested directions to his cabin. Rubenstein told Loque she could ride with him to the cabin the next day. However, Rubenstein canceled the trip and rescheduled it for the following day, but then canceled again. When Loque persisted in requesting directions to the cabin, Rubenstein told her she would be unable to find the remote cabin on her own. Sometime later, Rubenstein informed Loque he had checked the cabin, but the Perrys were not there.

---

[1] In the record, the father's name is spelled three ways, "Darrell," "Darryl," and "Daryl." For consistency, we will use "Darrell" unless taken as a quote from the record.

[2] In the record, the mother's name is "Anne," but she went by "Annie."

[3] In the record, the child's name is spelled "Krystal" and "Crystal." For consistency, we will use "Krystal" unless taken as a quote from the record.

*Statements to Sheriff C.V. Glynnis*

¶5.    On December 16, 1993, Rubenstein called the Pike County Sheriff's Department and informed Investigator Donald Lindley he had discovered the murdered bodies of the Perry family at the cabin.   Rubenstein later went to the Police Department in Summit where he was interviewed by Pike County Sheriff C.V. Glynnis.[4]   According to Sheriff Glynnis's notes, which he typed following the interview, Rubenstein stated that sometime around November 6, he drove Darrell, Annie, and Krystal from New Orleans to the cabin.   Darrell and Annie told him to leave because people were coming to the cabin, and he did not need to be there.   On November 16, Darrell made a collect call and talked to Rubenstein and his wife, Doris.   On November 27 or 28, Rubenstein drove to the cabin and knocked on the door, but no one answered.   While he normally had a key to the cabin, he did not have his key on that day.   A next door neighbor, Shawn, told him Darrell was in New Orleans.   Rubenstein returned to the cabin on December 16 and found the bodies.

¶6.    Rubenstein told Sheriff Glynnis that Darrell had recently been released from prison but, while he was in jail, "Annie had a black male boyfriend, Sydney," who Krystal called her "stepdaddy."   During Darrell's incarceration, Rubenstein and Doris had custody of Krystal. Rubenstein did not inform Sheriff Glynnis that he and Doris had taken out a $250,000 life insurance policy on Krystal.

¶7.    After interviewing Rubenstein inside the Summit Police Department, Sheriff Glynnis testified he walked back to the car with Rubenstein, at which point Rubenstein slapped his palm

---

[4] In the record, the sheriff's name is spelled two ways, "Glennis" and "Glynnis." For consistency, we will use "Glynnis" unless taken as a quote from the record.

3

or his fist on the top of the car and stated that he was afraid "that nigger Sydney" sexually assaulted Krystal.[5]   Sheriff Glynnis testified from the notes he typed following his interview with Rubenstein.  However, his notes did not include the incident at the car or the racial epithet attributed to Rubenstein.

*Gail and Creshon Jackson*

¶8.   Gail Jackson, who lived next door to Rubenstein's cabin, stated she never saw the Perrys with a vehicle, and they had no telephone in the cabin.  Jackson did not see the Perrys, or anyone else, at the cabin during the four- or five-week period preceding the discovery of the bodies.  Also, she noticed the same lights stayed on in the cabin during this time.

¶9.   Approximately a week-and-a-half before the bodies were discovered, Jackson sent her son, Creshon, to check on the Perrys, but no one came to the door when he knocked.  On December 16, 1993, Rubenstein told Creshon he had discovered bodies in the cabin, but he did not say whose bodies he found.  The only person Creshon ever saw at the cabin was Rubenstein.

*Glen Allen Applewhite's Investigation*

¶10.   Glen Allen Applewhite ("Officer Applewhite"), a criminal investigator for the Mississippi Highway Patrol, conducted an investigation in conjunction with the Sheriff's Department.  Based on Sheriff Glynnis's interview with Rubenstein, Officer Applewhite and his staff focused their investigation on Sidney Page and another suspect named Walter Stevenson.

---

[5] The actual testimony, which we need not repeat here, graphically described the sexual assault feared by Rubenstein.

4

¶11. On January 5, 1994, Officer Applewhite spoke with Rubenstein and his daughter, Tonya, at their home in Louisiana. Tonya remembered seeing Darrell and Annie on December 2, 1993, at a local bar named "Mudbugs." Officer Applewhite then spoke to Loque, who told him Darrell and Annie were completely dependent on Rubenstein for food, money, and transportation. Officer Applewhite also learned from Annie's best friend, Sue Bellow, that Rubenstein went to Summit on November 16 to pick up Darrell and Annie. On January 12, Darrell's brother, David, told Officer Applewhite about the Rubensteins' $250,000 insurance policy on Krystal.

¶12. Lisa French stated that, sometime around November 16, she saw a green van in the area of the cabin. Officer Applewhite followed up on the lead but learned no further information about the van.

¶13. Officer Applewhite's investigation turned up no fingerprints, DNA, or blood samples linking Rubenstein to the crime. The earliest letters in the mailbox were post-marked November 15, 1993, and the latest were postmarked December 8, 1993.

*Dr. Steven Hayne's Findings*

¶14. At the time of the murders in 1993, Dr. Emily Ward was the medical examiner. Dr. Steven Hayne, a forensic pathologist, later reviewed Dr. Ward's autopsy reports and was called by the State to testify at trial. Dr. Hayne testified Annie died of multiple stab wounds. She had eight stab wounds to the chest area, including two lethal wounds to the left lung. He found no evidence of defensive wounds.

¶15. Darrell's body, like Annie's, was in an advanced state of decomposition. His body had numerous stab and slash wounds, including a very deep, seven-inch slash wound across his

5

neck. Three other wounds to Darrell's arms indicated defensive posturing during a struggle. Darrell had four lethal stab wounds, two to the chest and two to the abdomen. No blood samples were taken due to the decomposition of the bodies. Urine samples indicated both Annie and Darrell had nicotine, caffeine, and acetaminophen in their systems.

¶16. Krystal suffered a hemorrhage to the neck area, and her death was caused by strangulation. A few hairs were found under her body and were determined to be those of a Caucasian. Dr. Hayne opined that Krystal died at or about the same time as the adults, and that the deaths occurred weeks to months before the family was discovered.

*Confession to Earl Ballinger*

¶17. At some point, Rubenstein became the focus of the investigation, and in September, 1998, he was indicted by the Pike County Grand Jury and captured in Louisiana. While being held for extradition in the Jefferson Parish Correctional Center, Rubenstein met an inmate, Earl Ballinger, who was also fighting extradition to Mississippi, but who was unaware of the deaths which were the subject of Rubenstein's arrest. Ballinger testified he and Rubenstein often talked about ways to fight extradition. According to Ballinger, Rubenstein said that five years earlier, he had "shot his wife, his daughter, and his daughter's boyfriend." Ballinger also testified Rubenstein said he shot his wife for being a "bitch" and having drinking problems and his daughter for running around with black men and "their drugs." Ballinger said Rubenstein gave no reason for killing the boyfriend.

*Confession to James Stevens*

¶18. Rubenstein was extradited to Mississippi and housed in the Pike County Jail with James Stevens, who testified to various conversations with Rubenstein:

6

At that time he told me that he had planned to hire somebody to kill his stepson, daughter-in-law and the granddaughter. He changed his mind. He was coming to his camp in Summit about two weeks before Thanksgiving. He went there, he killed his stepson, his daughter-in-law with a knife. He did not specifically say how he killed his granddaughter, it was strangulation, choked, or suffocation. And that after that he left, he went to the Jackson's [sic] house. These were neighbors of his. He asked if they saw them. . . .

Later on in December he went back. The bodies were still there, same places. His granddaughter was on the bed nude. His stepson, the eyes were gone, there were maggots on him. And his daughter-in-law was laying where she was at. She had a hole in her stomach the size that you could put your fist in. And basically that was it.

¶19. Stevens testified Rubenstein said he killed his family for insurance money, which he recalled being about $200,000. Rubenstein planned the murders to look like a drug deal gone bad by planting two kilos of cocaine around the cabin, but the drugs were never found.

*The Insurance Policy*

¶20. George Hiene, an insurance agent for New York Life in Louisiana, testified Rubenstein contacted him sometime in December 1990 about taking out life insurance policies on his grandchildren. The application date for Krystal's $250,000 policy was September 13, 1991. Doris, Krystal's blood relative, was the owner and first beneficiary, Rubenstein was the second beneficiary, and Annie and Darrell were the third beneficiaries. According to Hiene, Rubenstein would have had no insurable interest on Krystal had he not been married to Doris.

¶21. On January 26, 1994, Doris and Rubenstein signed a claim for the $250,000 proceeds on Krystal's policy. Hiene testified that, even though he was notified of threatened litigation over the proceeds, the company disbursed the proceeds on April 13, 1994. Hiene also testified that in his twenty-four years as an agent, he never had a $250,000 policy taken out on a two-year-old child.

7

*Prosecution of Rubenstein*

¶22. Rubenstein was indicted by the Pike County Grand Jury for the capital murder of Krystal while engaged in the commission of felonious child abuse. His indictment also included counts for the murders of Annie and Darrell and for wire fraud. The count of wire fraud was dismissed. The first trial resulted in a mistrial after the jury failed to reach a unanimous verdict. Rubenstein was tried a second time, and the jury convicted him on all three murder charges.

¶23. On February 5, 2000, following a sentencing hearing on the capital murder charge, the jury sentenced Rubenstein to death for the capital murder of Krystal. Circuit Judge Keith Starrett sentenced Rubenstein to serve two consecutive terms of life imprisonment for the murders of Annie and Darrell. Rubenstein's post-trial motions were denied, and he appealed to this Court. We now proceed to address twenty-seven[6] of the thirty-three assignments of error presented for our consideration.

**DISCUSSION**

### I. Whether the trial court erred in admitting hearsay evidence, including testimony about Rubenstein's relationship with Annie.

¶24. Rubenstein argues the trial court improperly allowed trial witnesses to present hearsay testimony based on statements allegedly made to them by Annie. Rubenstein's argument focuses on the testimony of Sidney Page, Kay Kelly, Sue Bellow, and Carla Denham.

*Sidney Page*

---

[6] Six of Rubenstein's assignments of error (briefed as errors XIX, XXVI, XXVIII, XXIX, XXX, and XXXIII) are moot because they relate to the sentence of death, which we reverse pursuant to our discussion in Issue XXV.

¶25. Sidney Page testified he met Annie when Krystal was approximately four or five months old, and they became friends; however, they lost touch for about a year-and-a-half until they ran into each other when Page sold Darrell $100 worth of crack cocaine. After that meeting, Page and Annie began "hanging out" occasionally. Page testified he was in jail from January 1990 to February 1991. After his release, he and Annie began a serious relationship. They lived together for six to eight months, and during this time, Krystal usually stayed with Rubenstein and his wife.

¶26. The State asked Page what Annie had told him about Rubenstein. Page testified that Rubenstein did not like black people, especially Page, and that Rubenstein told Annie if she did not leave Page, she would never get her daughter back. The defense failed to object to this testimony. The State then asked Page what, if anything, Annie told him would have to occur in order for her to see Krystal. Page further testified that Annie would have to have sex with Rubenstein.[7] Again, the defense made no objection.

¶27. The State argues that, where a party fails to raise a contemporaneous objection to a witness's testimony, the party is barred from raising the issue for appellate review. We agree. "'[I]f no contemporaneous objection is made, the error, if any, is waived.'" *Walker v. State*, 671 So. 2d 581, 597 (Miss. 1995) (quoting *Foster v. State*, 639 So. 2d 1263, 1270 (Miss. 1994)). Application of the contemporaneous objection rule is not diminished in a capital case. *Foster*, 639 So. 2d at 1270.

---

[7] On cross-examination, the defense questioned Page as to whether Annie had sex for money and whether she had sex with various other men besides Rubenstein.

¶28. When Page began giving an example of Annie's interactions with Rubenstein, the defense finally objected and asked that Page be instructed to testify only as to his personal knowledge. The State responded that Page's testimony was a hearsay exception under Mississippi Rule of Evidence 804(b)(5), and the trial court agreed. The trial court later made a detailed statement into the record regarding the defense's objection.

¶29. Mississippi Rule of Evidence 804(b)(5) provides:

> **(b)** **Hearsay Exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
> (5) *Other Exceptions.* A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it . . . .

¶30. In *Parker v. State*, 606 So. 2d 1132, 1138 (Miss. 1992), we analyzed the five requirements for the admission of hearsay under M.R.E. 803(24), which provides the same residual exception for the admission of hearsay as M.R.E. 804(b)(5), regardless of whether the declarant is available to testify. We further held our analysis applied to M.R.E. 804(b)(5). *Parker*, 606 So. 2d at 1138. The five requirements are "trustworthiness, materiality, probative value, interests of justice, and notice." *Id.* (citing *Motorola Commun. & Elecs., Inc. v. Wilkerson*, 555 So. 2d 713, 720 (Miss. 1989)). An on-the-record finding as to these five factors is generally required, and "[t]he trial judge has considerable discretion in determining

whether to admit hearsay evidence under this exception and his decision will not be overturned except for an abuse of discretion." *Parker*, 606 So. 2d at 1138.

¶31. Here, the trial court carefully analyzed the five requirements for admissibility to Page's testimony and provided its findings as to each requirement. There is no evidence to support a claim the trial court abused its discretion in allowing the testimony. Rubenstein's assignment of error is without merit.

*Kay Kelly*

¶32. Kay Kelly, formerly Kay Slatten, testified she had been friends with Annie for five or six years, and she lived with Annie in an apartment sometime in 1992 or 1993. While they lived together, she said Annie and Page were in a relationship, but he did not live with them. Kelly testified that Annie, Page, and Krystal seemed happy together. She also stated she rarely saw Darrell because he was always in prison. After an argument over Annie's drug use, Kelly moved out and never saw Annie again.

¶33. The State questioned Kelly about Rubenstein's repeated requests for her to sign a statement saying she saw Darrell and Annie between November and December 1993 in New Orleans. Kelly testified that she never saw them, but Rubenstein pressured her to make this false statement. The defense did not object to this line of questioning and, absent a contemporaneous objection, any error is waived. *Moawad v. State*, 531 So. 2d 632, 634 (Miss. 1988) (failure to object waives error).

¶34. The State also questioned Kelly about Annie's relationship with Rubenstein. Kelly testified the relationship was not strictly father-in-law and daughter-in-law; rather, it was a sexual relationship. Kelly testified that when Krystal had chicken pox, Annie asked Rubenstein

for some money to buy lotion, but before he would give Annie anything, he made her leave with him while Kelly watched Krystal. Kelly stated that when Annie returned, she said Rubenstein forced her to have sex with him in order to get money to buy the lotion. The defense made no objection and cannot now claim error. *Walker*, 671 So. 2d at 597.

*Sue Bellow*

¶35. Sue Bellow[8] testified she knew Annie for two years before her death. Bellow got to know Annie and Krystal when they moved in with Annie's mom across the street. Bellow testified she spent, on average, fifteen to twenty hours a day with Annie, who did not work and received welfare.

¶36. Bellow stated the last time she saw Annie was the morning of November 5, 1993, before the family left for Mississippi. According to Bellow, Krystal asked to stay home, and Annie agreed because she and Darrell would not be gone long. However, Rubenstein told Annie, "well, if you are going to work on your marriage, don't you think you need the whole family." Annie relented and told Krystal she had to go, so they both left with Rubenstein. The defense did not object, so it waives any error. *Moawad*, 531 So. 2d at 634.

¶37. Bellow testified Annie was to return on November 16 because they were going out for Bellow's birthday. Annie called Bellow collect on November 11 and said she could not wait for Rubenstein to pick them up on November 16. The defense made no objection. *Walker*, 671 So. 2d at 597 (failure to object waives error).

---

[8] The record has Bellow's name spelled "Bellow" and "Bellows." Some witnesses also called her "Sue Bellub." For consistency, we will use "Bellow" unless taken as a quote from the record.

12

¶38.    Bellow testified Annie said her reasons for going to Mississippi were (1) so she and Darrell could work on their marriage, and (2) because Rubenstein said they could make some money by having a car accident in Mississippi.  Again, the defense did not object.  *Moawad*, 531 So. 2d at 634 (failure to object waives error).

¶39.    Bellow also testified Annie told her she had sex with Rubenstein for money.  The defense did not object to Bellow's testimony on this issue until well into this line of questioning.  The record reflects Bellow described a time when Annie called Rubenstein from Bellow's house to borrow $30 to buy Krystal a birthday present.  Annie soon hung up and started crying.  Bellow testified that Annie told her, "I guess Crystal won't get anything for her birthday, because I have to go spread my legs in order to get $30."  The State then asked if Bellow knew if anything like that had happened in the past, and Bellow responded that Annie said, "any time she needed anything, she would say she'd pay him back and he would tell that, you know how to pay me back, you know how I want the money."  At this point, the defense objected, but the trial court overruled the objection, finding the testimony to be an exception to the hearsay rule.[9]  The trial court did not abuse its discretion in allowing testimony as to Annie's and Rubenstein's sexual relationship.  *Parker*, 606 So. 2d at 1138.

¶40.    Following the ruling, the State questioned Bellow regarding Annie having sex with Walter Stevens for money.  The defense did not object.  *See Walker*, 671 So. 2d at 597.

---

[9] As noted above, the trial court previously overruled an objection to similar testimony by Page, finding it was a hearsay exception under M.R.E. 804(b)(5).  The same reasoning applies to Bellow.  Furthermore, the transcript from the first trial shows the trial court made a detailed finding that Bellow's testimony fell within M.R.E. 804(b)(5) and cited to this Court's holding in *Parker*.

13

¶41. Rubenstein's complaints about Bellow's testimony are without merit because either the defense failed to contemporaneously object to the alleged errors or the trial court properly allowed the testimony under M.R.E. 804(b)(5).

*Carla Denham*

¶42. Carla Denham, Annie's sister, testified that the night before Annie left for Mississippi, they spoke on the telephone. Annie told Denham she was going to a cabin in Mississippi, and she planned "to do an insurance scam" while there. The State asked if that night was the first time the insurance scam was discussed, and Denham testified it was not. The defense did not raise any objection until the State asked, "[h]ow long before - - [that night did Annie mention the insurance scam]?"

¶43. The defense asked to approach the bench, and the trial court excused the jury to hear the defense's M.R.E. 403 objection. We find the trial court made a thorough and proper balancing review on the record, finding the testimony was more probative than prejudicial. The trial court ruled:

> **Under 404(b), the Court ruled previously that the knowledge of insurance was important, and allowed some of this testimony in under the exception to the general bar against proving prior bad acts. There was a balancing test gone through under 403, and this testimony regarding the reason why the victim went to Mississippi is probative and should be admitted because it is part of the body of the crime, that they were, the purpose or what the victims were told by the defendant.**

> The State's theory of the case is that the victims were lured to Mississippi for the purpose of perpetrating an insurance fraud. This is proof of that. It is part of the web that has been woven in this case. And to try to separate it out would make it so sterile that it would not be understandable. . . . The corroboration for this testimony is significant. . . .

14

> **Under Rule 403, I find that this is more probative than prejudicial.** Especially in view of the light that the record is replete with bits and pieces regarding Mr. Rubenstein and these victims' involvement in them. . . .

(Emphasis added). When the jury returned, Denham testified that approximately two to three weeks before they left, Annie said, "they were going to do a [sic] insurance scam. It was supposed to be some kind of car accident."

¶44. Rubenstein argues the trial court failed to conduct a balancing test and improperly allowed testimony from Denham that was more prejudicial than probative. The argument is without merit. The trial court did not abuse its discretion in admitting Denham's testimony. *See Jenkins v. State*, 507 So. 2d 89, 93 (Miss. 1987).

*The Confrontation Clause*

¶45. The Confrontation Clause of the Sixth Amendment of the United States Constitution provides, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. amend. VI. Article 3, Section 26 of the Mississippi Constitution provides an almost identical protection. This Court has stated the purpose of the Confrontation Clause is "'to advance the accuracy of the truth determining process . . . by assuring that the trier of fact has a satisfactory basis for evaluating the trust of a prior statement.'" *Lanier v. State*, 533 So. 2d 473, 488 (Miss. 1988) (quoting LaFave and Israel Criminal Procedure § 23.3(d) at 877-78 (1985) (quoting *California v. Green*, 399 U.S. 149, 90 S. Ct. 1930, 26 L. Ed. 2d 489 (1970)).

¶46. In *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), the United States Supreme Court held the Confrontation Clause bars out-of-court statements by witnesses that are testimonial, unless the witnesses are unavailable and the

15

defendant had the opportunity to cross-examine them. Testimonial statements are those reasonably expected to be used "prosecutorially," such as confessions, affidavits, custodial police examinations, and depositions. *Id.* at 51-52.

¶47. In this case, the statements Rubenstein claims violated his Sixth Amendment right to confront witnesses against him do not constitute testimonial hearsay. In *Crawford*, the Court acknowledged the distinction, stating, "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law - as does *Roberts*, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether." *Id.* at 68.

¶48. First, Rubenstein never objected at trial on the basis the testimony violated the Confrontation Clause. *See Walker*, 671 So. 2d at 597 (failure to object waives error). Second, the statements were not testimonial. The trial court determined the declarant, Annie, was unavailable, and it made an on-the-record finding that the evidence possessed adequate indicia of reliability and particularized guarantees of trustworthiness. Rubenstein's right to confrontation was not compromised, and this assignment of error is without merit.

## II. Whether the trial court erred in allowing testimony concerning alleged prior bad acts.

¶49. Rubenstein argues the trial court committed reversible error by allowing the State to introduce evidence of alleged prior bad acts, and he requests a new trial based upon this error. We find that of the sixteen statements pointed to by Rubenstein, many were without objection or the objections were properly sustained. The contemporaneous objection rule applies in death penalty cases. *Scott v. State*, 878 So. 2d 933, 988 (Miss. 2004); *Williams v. State*, 684

16

So. 2d 1179, 1203 (Miss. 1996). Therefore, any issue to which Rubenstein failed to object is procedurally barred. **Howard v. State**, 507 So. 2d 58, 63 (Miss. 1987).

*Statement 1*

¶50. Officer Applewhite testified, "[f]rom the information that we had received, after talking with [David Perry], we knew that Mr. Rubenstein had come to Mississippi on [November 16]. We also had information of insurance scams that had been done." The trial court **sustained** the defense's objection. However, before the trial court could instruct the jury to disregard the statement, defense counsel said, "I'll pass over it, Judge. That's fine." Therefore, the trial court did not err, and Rubenstein's complaint is without merit.

*Statement 2*

¶51. The State asked Officer Applewhite, "[a]re you aware of any other life insurance policies, that Mr. Rubenstein had, on anyone who was not his grandchildren?" The officer replied affirmatively. Rubenstein made no objection, so his complaint about this statement is procedurally barred. **Foster**, 639 So. 2d at 1270 (failure to object waives error).

*Statement 3*

¶52. Defense counsel questioned Officer Applewhite as to what David Perry told him when he visited David in the hospital. Officer Applewhite testified that David discussed Rubenstein's knowledge of and involvement in insurance fraud schemes.

¶53. Rubenstein asked the questions that elicited this answer. Indeed, prior to the officer answering, the State tried to intercede, but the defense insisted he be allowed to speak. The defense then objected, although he articulated no reason for the objection, only the words, "No, Judge stop him." A defendant cannot complain on appeal about errors he invited. **Caston v.**

17

***State***, 823 So. 2d 473, 502 (Miss. 2002) (citing ***Singleton v. State***, 518 So. 2d 653, 655 (Miss. 1988)). Rubenstein opened the door, and he cannot now claim error.

*Statement 4*

¶54.     When testimony continued, Rubenstein questioned whether the officer's information came from notes taken during his interview with David. He testified, "[f]rom the notes, that they have a copy of, David told us about the night of the 16th or 17th that Mr. Rubenstein was aggravated when he left. Mike - - told Mike to tell Darrell that - - ," at which point the trial court stopped the testimony and excused the jury.

¶55.     Rubenstein objected to Officer Applewhite's discussion of insurance and asked for a mistrial. The trial court overruled the objection and denied the motion. However, the trial court made an extensive on-the-record finding on this issue.

¶56.     The trial court stated the insurance issue was extensively testified to in front of the jury at the last trial, and the defendant had been furnished a copy of the report from Officer Applewhite's interview with David Perry. Although the witness was reluctant to answer questions which would bring up the insurance issue, defense counsel forcefully directed Officer Applewhite to respond. Given Rubenstein's notice of the content of the answers as well as his demand for them, the trial court determined Officer Applewhite could respond, adding, "[t]he door has been, not just cracked, but it has been thrown wide open to this answer." The trial court concluded, "[i]f you ask a question and it calls for a hearsay answer, and there is no objection, yes, sir, the witness can answer it."

¶57.     The trial court did all that was necessary for this statement by making a proper on-the-record ruling. Accordingly, Rubenstein's complaint about this statement is without merit.

*Statement 5*

¶58.    Rubenstein argues Officer Applewhite continued to reference Rubenstein's involvement in insurance scams while on cross-examination.    After the trial court made its on-the-record finding discussed in Statement 4,    Rubenstein objected to Officer Applewhite's testimony coming before the jury pursuant to M.R.E. 403.    The trial court then limited the testimony to automobile insurance scams.

¶59.    Once testimony resumed before the jury, Officer Applewhite stated Rubenstein was involved in automobile insurance scams in Texas and Louisiana with other family members. Officer Applewhite later referred to information concerning "previous insurance scams that was done [sic] with Mr. Rubenstein and other members of the Perry family," including scams involving car insurance.

¶60.    Again, this information was elicited during cross-examination by the defense.    After Officer Applewhite was allowed to finish his answer to the original question, Rubenstein continued to ask more questions concerning the alleged insurance scams.    Rubenstein did not object to these statements, so any error is barred from review for failure to object.    *Scott*, 878 So. 2d at 988.    In addition, Rubenstein opened the door by asking about the scams and continuing along the line of questioning.    *Caston*, 823 So. 2d at 502.    We find Rubenstein's complaints about these statements are without merit.

*Statement 6*

¶61.    Officer Applewhite testified on cross-examination about other life insurance policies in the 1970's and how "other life insurance policies were considered that changed the focus of the investigation on January the 12th, from knowledge - information."

¶62. Rubenstein did not object to the officer's first statement that "we were informed of another life insurance policy that happened in 1970." Rubenstein continued to question Officer Applewhite as to why he focused on Rubenstein on January 12, implying that knowledge of an insurance policy on Krystal was the key factor. When the officer began to answer that he investigated two policies, the trial court interrupted him and excused the jury.

¶63. The officer was trying to explain that authorities relied upon more than just Krystal's policy for suspecting Rubenstein. After the jury was excused, the trial court cautioned Rubenstein that his questioning could open the door to unfavorable testimony. Prior to the jury's return, the trial court warned the officer that before he said anything about the 1979 insurance policy, he was to stop and make sure it understood where his answer was going.

¶64. Rubenstein claims the trial court did not caution the officer about references to "another policy," but clearly the record reflects the trial court warned the officer to stop before stating anything about the 1979 policy. Thus, Rubenstein's complaint is without merit. As for the officer's statement that the investigation shifted to Rubenstein because of other insurance policies, Rubenstein made no objection. Therefore, the issue is waived and procedurally barred. *Howard*, 507 So. 2d at 63 (failure to object waives error).

*Statement 7*

¶65. Officer Applewhite testified on cross-examination, "Sir, if you are asking me if the investigation was not completed, there are a lot of things that this jury doesn't know about the investigation." He gave this answer in response to Rubenstein's question of whether he thought the identity of the owner of the hairs found near Krystal's body was irrelevant. Rubenstein claims Officer Applewhite's response was "yet another reminder of the prior life insurance

20

policy." Rubenstein never objected to this statement; therefore, the asserted error is procedurally barred. *Scott*, 878 So. 2d at 988.

¶66. Procedural bar notwithstanding, Rubenstein disingenuously claims the response was a reminder of the life insurance policy. The officer gave a vague answer to a question wholly unrelated to the issue of insurance. Further, the preceding testimony concerned physical evidence of blood on Darrell's shoes and hairs found near Krystal's body. There had been no discussion of insurance policies for several pages of transcript prior to this response. We find there is no error.

*Statement 8*

¶67. Officer Applewhite responded to defense questions on cross-examination concerning life insurance policies for Rubenstein's wife and granddaughters. The State intended to ask about insurance because, it argued, Rubenstein opened the door to this type of redirect examination question. The State proffered Officer Applewhite's testimony, out of the jury's presence, in which he stated authorities considered life insurance policies other than those of Rubenstein's wife and granddaughters, and said Rubenstein had attempted to collect on a business insurance policy on a former partner, Harold J. Conner.

¶68. Prior to a ruling on whether this testimony could go before the jury, the defense suggested, and the parties agreed to, a stipulation about Rubenstein's knowledge of the workings of insurance.[10] The trial court also conducted a M.R.E. 403 balancing test and

---

[10] The stipulation stated:

> That the Defendant had knowledge of the contestability clause of insurance policies.
> That the Defendant was familiar with the insurable interest clause in life insurance policies.
> That the Defendant was aware of the way insurance companies process claims.

21

determined the officer's testimony was probative to rebut the claim that Rubenstein purchased policies on his wife and grandchildren for philanthropic purposes. Additionally, the trial court stated the omission of references to other policies would imply the life insurance policies were the only ones relied on by authorities. Finally, the trial court found the defense had opened the door to this testimony. The trial court did prohibit testimony alleging Rubenstein was involved in Conner's death.

¶69. After the jury returned, the State only asked Officer Applewhite (1) whether he was aware Rubenstein had life insurance policies on non-family members, and (2) whether he could confirm the alleged automobile scams described by David.

¶70. Rubenstein now suggests he was forced into the stipulation by the trial court's ruling that the State could conduct a redirect examination of Officer Applewhite concerning Rubenstein's alleged prior bad acts involving life insurance.

¶71. First, Rubenstein made no formal objection to this issue. *Moawad*, 531 So. 2d at 634 (failure to object waives error). Second, the trial court determined Rubenstein opened the door to questions involving insurance policies, especially when he implied the policies on the girls were for their education. *Singleton*, 518 So. 2d at 655. Further, Rubenstein suggested and negotiated a stipulation to be read to the jury. The State only asked for a "yes" or "no" answer to its two questions on redirect. Rubenstein's complaint is without merit.

*Statement 9*

And that the Defendant had policies of insurance on persons who were not related to him in the past.

22

¶72. Rubenstein argues the trial court erred by allowing the State to ask Officer Applewhite whether the authorities were able to confirm David's statements. Rubenstein made no contemporaneous objection, so he has waived appellate review of this issue. *Scott*, 878 So. 2d at 988.

¶73. Rubenstein argues that "Mr. Shields objected to no avail and went forward with the stipulation." The record reflects the defense failed to lodge an objection. To the extent that Rubenstein's argument is intended to relate back to the trial court's denial of his request to reconsider in Statement 8, the complaint is still without merit for the reasons given above.

*Statement 10*

¶74. The State asked Sheriff Glynnis, "and what, if anything, did [Rubenstein] tell you concerning an insurance scam, or anything of that nature?" Rubenstein claims the State knew he said nothing to the sheriff about any scam, and even though the objection was sustained, the prejudicial information went before the jury. Rubenstein did not object to this question at trial on the ground that it was prejudicial; rather, defense counsel claimed it was leading. The trial court did not believe the inquiry was leading, but it sustained the objection nonetheless. Sheriff Glynnis never answered the question.

¶75. Because Rubenstein did not object to the question on the ground of prejudice, he has waived appellate review of this error. *Carter v. State*, 722 So. 2d 1258, 1261 (Miss. 1998) ("Objection on one ground at trial waives all other grounds for objection on appeal."). In any event, the trial court sustained his objection, so Rubenstein's complaint is without merit.

*Statement 11*

23

¶76. Rubenstein argues the State elicited inflammatory and irrelevant testimony about insurance scams from Page. When questioned by the State why Annie went to Mississippi, Page testified she went "to do something for Mr. Mike," and he "just figured it was another scam, you know, insurance scam for pills or something like that." The record reflects that Rubenstein did not object. Therefore, this issue is waived. *Scott*, 878 So. 2d at 988.

*Statement 12*

¶77. On cross-examination, Page stated he heard from Annie, Darrell, and David that they had committed scams involving car accidents and pills for Rubenstein. The record reveals Rubenstein failed to object to these statements; therefore, the issue is waived. *Williams*, 684 So. 2d at 1203 (failure to object waives error).

¶78. Furthermore, the trial court ruled the defense opened the door for Page's testimony, and his statements were trustworthy because of his significant relationship with Annie. *See* M.R.E. 804(b)(5). The trial court acknowledged that while the testimony was hearsay, "the question was asked why, and I think this witness should be allowed to answer the question. He had an opinion. And he was asked why. And he'll be allowed to give it."

¶79. Rubenstein opened the door to Page's statements, and the trial court made thorough, on-the-record findings as to this issue. Following this ruling, the defense did not object to Page's continued testimony that Annie, Darrell, and David told him of insurance scams. *Scott*, 878 So. 2d at 988 (failure to object waives error). This complaint is meritless.

*Statement 13*

¶80. Darrell's brother, Michael Perry, was asked what he knew about insurance scams involving Rubenstein. Michael began to testify that he was involved in scams, but defense

counsel interrupted and insisted Michael only testify to his personal knowledge. The State and trial court agreed with the defense, so Michael only testified about his participation in insurance scams in 1981 and 1983. Michael's answers conformed with the defense's request. Accordingly, we find no error as to these statements.

¶81. Rubenstein also claims he objected to the relevance of testimony concerning the purpose of airline tickets involved in the 1983 airport scam. The State argued the testimony concerned the *modus operandi* and the complexity of the scams, and the trial court overruled the objection. Rubenstein argues the trial court failed to perform a M.R.E. 403 analysis, but we find both sides presented arguments from which the trial court made a ruling. Rubenstein did not ask the trial court to make a probative versus prejudicial finding, but merely objected to the tickets' relevance. Rubenstein's complaints about these statements are without merit.

*Statement 14*

¶82. Denham testified on direct examination by the State that Annie said she was going "to do an insurance scam." Rubenstein objected, arguing the case was not an insurance fraud case, and stated, "[t]his has no place in this trial. Under 403 and 404, 402, under any imagination." The trial court made an extensive on-the-record finding pursuant to M.R.E. 404 and M.R.E. 403, and it determined the questioning to be admissible.[11]

¶83. The trial court did not err by admitting this testimony. The State's theory of the case was that Rubenstein used the prospect of an insurance scam to lure Annie and Darrell to the Mississippi cabin. The trial court made a Rule 404(b) analysis, performed a Rule 403

---

[11] The trial court's reasoning is quoted in Issue I under "Carla Denham."

25

balancing, and found the testimony admissible to assist the jury in comprehending the case. Rubenstein's complaint is without merit.

*Statement 15*

¶84.   Sue Bellow testified Annie told her "they were going to Mississippi and have a car accident for Mike to collect some money so they could get their own place and get away from her mom's."   Rubenstein failed to object, so the issue is procedurally barred.   ***Moawad***, 531 So. 2d at 634 (failure to object waives error).

*Statement 16*

¶85.   Rubenstein called one of his fellow inmates, Donald Landrew, to testify.   Rubenstein claims that during Landrew's cross-examination, the State elicited more testimony about insurance scams as well as testimony about Rubenstein's attempted escape.   The defense failed to object, so the error is procedurally barred.   ***Scott***, 878 So. 2d at 988.

**III.   Whether the trial court failed to properly instruct the jury as to the testimony on other alleged prior bad acts.**

¶86.   Rubenstein argues testimony from Page, Kelly, and Bellow concerning Annie's alleged sex with him for money and Denham's testimony about the insurance scam, were inadmissible as prior bad acts,[12] and that the trial court should have conducted a balancing test pursuant to M.R.E. 404(b) and 403.   He further argues the trial court erred by failing to give a limiting instruction to the jury concerning this testimony about his prior bad acts.

---

[12] Issue I analyzed these statements based on Rubenstein's claim they were inadmissible as hearsay. This section examines whether the statements should have been excluded as prior bad acts.

¶87. Rubenstein used the testimony by Page, Kelly, and Bellow to his advantage by implying Annie slept around for money. Additionally, Rubenstein never objected to these statements on the basis of prior bad acts. *Carter*, 722 So. 2d at 1261 (objection on one ground waives all other grounds on appeal). In fact, he failed to object at all to these statements, as well as to Landrew's statement about Rubenstein's escape plan. Therefore, Rubenstein is barred from asserting these errors on appeal. *Walker*, 671 So. 2d at 597.

¶88. Rubenstein did vaguely object to Denham's testimony that Annie went to Mississippi to perform an insurance scam by stating, "[t]his has no place in this trial. Under 403 and 404, 402, under any imagination." Even given this general objection, the trial court conducted an extensive on-the-record finding pursuant to M.R.E. 404(b). The trial court then engaged in the appropriate M.R.E. 403 balancing analysis and found the testimony to be admissible. "The relevancy and admissibility of evidence are largely within the discretion of the trial court and this Court should only reverse where it is clear that discretion has been abused." *Simmons v. State*, 805 So. 2d 452, 487-88 (Miss. 2001). There was no abuse in this case.

¶89. Rubenstein's argument that the trial court failed to issue a limiting instruction is also without merit because he never raised the issue before the trial court. This Court in *Brown v. State*, 890 So. 2d 901, 913 (Miss. 2004), held a trial court is not obligated to give a sua sponte limiting instruction on evidence pursuant to M.R.E. 404(b). Rubenstein argues this issue should be analyzed under *Smith v. State*, 656 So. 2d 95, 100 (Miss. 1995), because *Brown* was handed down after his trial. In *Smith*, we held that after 404(b) evidence is admitted pursuant to a 403 balancing test, the trial court must give a limiting instruction. 656 So. 2d at 100.

*Brown* overruled *Smith* and returned to the M.R.E. 105 rule requiring counsel to request a limiting instruction. *Brown*, 890 So. 2d at 913.

¶90. An established principle of appellate review is that "[i]ssues not brought before the trial court are deemed waived and may not be raised for the first time on appeal." *Tate v. State*, 912 So. 2d 919, 928 (Miss. 2005) (citing *Wilcher v. State*, 479 So. 2d 710, 712 (Miss. 1985)). Rubenstein neither objected to the trial court's action nor questioned the omission, and only now upon review does he claim error.

¶91. In *Tate*, we confronted the *Smith*/*Brown* rule change and its effect on a pre-2004 trial. 912 So. 2d at 927-28. In that case, the defendant objected to the admission of two drug arrests on M.R.E. 404(b) grounds. *Id.* at 927. Defense counsel did not request a limiting instruction, and the trial court did not issue one sua sponte. *Id.* at 928. Although the subsequent discussion of *Brown* might have obscured the ultimate issue, we clearly stated that because Tate failed to request an instruction or raise the issue before the trial court, he was procedurally barred from doing so on appeal. *Id.*

¶92. Rubenstein similarly failed to raise this issue before the trial court, and we find the alleged error to be procedurally barred and without merit.

> **IV. Whether the trial court erred in allowing the State to introduce evidence of Rubenstein's alleged bad character.**

¶93. Rubenstein argues the trial court erred by admitting evidence of his alleged bad character. He claims the use of bad character evidence is prohibited under M.R.E. 404(a), and

28

its admission denied him the right to a fair trial.[13]   M.R.E. 404(a) states, "[e]vidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion . . . ."  Rubenstein provides examples from the testimony of Officer Applewhite and Page where he argues his alleged bad character was placed before the jury.  As discussed in Issues I, II, and III, Rubenstein either failed to object or failed to object based on Rule 404(a), so the issue is procedurally barred. Procedural bar notwithstanding, we will briefly examine the merits of the claim.

*Statement 1*

¶94.    Officer Applewhite testified that when he first approached David about the case, David "stated that he was uncomfortable, afraid."  Rubenstein argues the jury inferred from this testimony that David was afraid of his stepfather, Rubenstein.  The record reflects defense counsel objected, albeit with no specificity and without a 404(a) argument.  The trial court sustained the objection, so the officer did not finish his statement.  This issue is without merit.

*Statement 2*

¶95.    When the State asked Officer Applewhite what he told Rubenstein while transporting him from Louisiana to Mississippi, the officer testified, "I told him I thought he was a sorry sack of human s--t."  Later, when asked if he disliked Rubenstein, the officer stated, "anybody who hurts a child, I have dislike for."

¶96.    As to the first statement, the defense made no objection.  Therefore, Rubenstein's complaint about this statement is procedurally barred.  ***Scott***, 878 So. 2d at 988.  As for the

---

[13] However, Jury Instruction 9 stated that "no person may be convicted upon his reputation or character," that Rubenstein could only be convicted if he was proven "guilty beyond a reasonable doubt," and that the verdict " must not be based upon speculation, conjecture, or prejudice."

officer's second response, Rubenstein requested the statement be stricken and the jury be told to disregard the comment. The trial court told the jury that they were "the triers of fact and the ultimate issue of guilt is theirs to decide. No witnesses' testimony can take that job away from them." We find the trial court adequately addressed Rubenstein's concerns.

¶97. Additionally, on cross-examination, Rubenstein used Officer Applewhite's testimony to his advantage by portraying the officer as prejudiced against Rubenstein. This assignment of error is without merit.

*Statement 3*

¶98. The defense asked Officer Applewhite at "what point did [he] decide that [Rubenstein] was a sack of s - - t?" The officer responded, in part, that "[t]o the best of my knowledge, the Pike County victims rights fund paid for the burial of Krystal Perry." Rubenstein also points to a similar statement by Loque that Rubenstein failed to pay his share of the funeral expenses.

¶99. Rather than object to this testimony, Rubenstein simply requested the officer be more responsive to his questions and not go into a narrative. However, the officer's answer responded to the defense's question of when he formed his opinion of Rubenstein. As to Loque's statement, the record reflects Rubenstein made no objection. If no contemporaneous objection is made, the trial court cannot be found in error. *Moawad*, 531 So. 2d at 634. This issue is without merit.

*Statement 4*

¶100. On cross-examination, Rubenstein asked Officer Applewhite about the specific dates that Doris contacted him. The officer stated that Doris contacted him after "Mike Rubenstein left her penniless." Although Rubenstein now objects to this statement, he failed to do so at

30

trial. No contemporaneous objection was made, so the issue is procedurally barred. ***Scott***, 878 So. 2d at 988.

*Statement 5*

¶101. Page testified that Rubenstein disapproved of Annie's interracial relationship with him. Rubenstein claims Page attempted to paint him as a racist. Again, the record reflects Rubenstein made no objection, let alone an objection based upon M.R.E. 404(a), to the testimony. Therefore, the issue is procedurally barred. ***Williams***, 684 So. 2d at 1203.

*Statement 6*

¶102. Page testified on redirect examination that he told police he thought Rubenstein could have committed the murders. He also described Rubenstein as "not a good person." The record reflects Rubenstein did not object to either of these statements. Therefore, the issues are waived and procedurally barred on appellate review. ***Scott***, 878 So. 2d at 988.

*Statement 7*

¶103. On cross-examination, Page remarked that he had connections as a drug dealer, and Rubenstein was "known" in those circles. Page gave this answer in response to the defense's inquiry why he pointed the finger at Rubenstein. Rubenstein objected, and the trial court allowed the statement because Rubenstein opened the door to this type of response. ***Caston***, 823 So. 2d at 502 (cannot complain about invited errors). This issue is without merit.

*Statement 8*

¶104. Rubenstein generally argues that bad character evidence in the form of his alleged participation in insurance scams, Annie having forced sex with him, and any other incident involving life insurance, were inadmissible. These matters were addressed in detail in Issues

31

I, II, and III.  Additionally, the defense made no objection.  *Scott*, 878 So. 2d at 988 (failure to object waives error).  As such, the issue is procedurally barred, and we need not revisit this repetitious argument.

*Statement 9*

¶105.  At trial, Sheriff Glynnis testified that, after his interview with Rubenstein, they walked outside and Rubenstein hit the top of the car with his palm or fist and said he was afraid "that nigger Sydney" sexually assaulted Krystal.  Rubenstein argues the trial court committed reversible error by allowing the jury to hear this racially offensive comment which, Rubenstein points out, Sheriff Glynnis did not include in his original report, but rather included in his recollection of events more than five years later.

¶106.  Although it appears Judge Starrett believed he had granted an in limine motion precluding the testimony, we find no such ruling in the record.  In any event, the testimony came into evidence before the Pike County jury without objection.  Later, in discussing other objections, the trial court addressed Rubenstein's racially offensive statement and concluded it was admissible through Sheriff Glynnis's testimony.  In ruling the actual written report was inadmissible, Judge Starrett stated:

> To modify that statement, would have been to take it out of context and to detract from, modify the evidence in a way that was - - that I don't think is proper.  Under Rule 403, I find that it was more probative than prejudicial.  And of the probative of the alleged intent of the defendant to weave a web of deception to head the State's investigators in a direction away from himself.

¶107.  The extremely offensive racial epithet found its way into evidence without objection.  *Walker*, 671 So. 2d at 597 (failure to object waives error).  Even if Rubenstein had objected, he failed to establish the racial make-up of the jury, which is essential in making a

determination of the prejudicial effect of the offensive language. *See GMAC v. Baymon*, 732 So. 2d 262, 272 (Miss. 1999).

¶108. Rubenstein's racial comment may have provided some value to the jury in understanding his efforts to cast suspicion on another person, but the epithet itself was of no value and served no purpose other than to prejudice African-American jurors and others offended by the use of the word. Thus, while we agree with the trial court that the statement was an attempt by Rubenstein to divert suspicion from himself, we do not agree the entire statement was more probative than prejudicial. The probative substance of the statement was that Rubenstein accused Page of sexually assaulting Krystal. The racial slur directed at Page did not render the statement any more or less probative, nor could it have been helpful to the jury.[14] However, Rubenstein did not object to the statement, did not move the trial court to exclude the epithet from the statement, and did not establish the racial make-up of the jury. Thus, any objection is waived.

> **V. Whether the trial court erred in allowing the admission of testimony in violation of the rules of evidence and Rubenstein's right to confrontation.**

¶109. Rubenstein argues his constitutional right to confrontation was violated when the trial court admitted hearsay statements of declarants who were available to testify at trial. As a preliminary matter, the record reflects the trial court carefully instructed the jury concerning hearsay testimony. The trial court explained that a statement made out of court is only

---

[14]This Court has found reversible error where a trial court allowed into evidence unnecessary elements of racial prejudice. *See Gaston v. State*, 239 Miss. 420, 423, 123 So. 2d 546, 548 (1960) (reversed because sheriff testified he was looking for a "Negro" named Frank Ed Hill).

admissible where it meets an exception to the rule against hearsay or when it is not offered to prove the truth of a matter asserted, but rather for some other purpose allowed under the rule.

¶110. Rubenstein also claims his right to confrontation was violated because witnesses, such as David Perry and Doris Rubenstein, were available to testify, but the State did not call them. The fact that the State did not call these witnesses is of no consequence because, as the trial court noted, either side could have called them. Thus, Rubenstein's claim is without merit.

*Testimony of Officer Applewhite*

¶111. Officer Applewhite provided testimony on several out-of-court statements which Rubenstein claims are hearsay. In explaining how he proceeded with his investigation, Officer Applewhite testified that David told him Rubenstein went to Mississippi on November 16 to bring home Darrell and Annie, and that David told him Darrell called on that day. The State says these statements are not hearsay because they were admitted to explain the officer's course of investigation. We agree.

¶112. Rule 803 of the Mississippi Rules of Evidence provides twenty-five exceptions to the rule against hearsay, even when the declarant is available to testify at trial. In addition to specific exceptions, M.R.E. 803(24) provides:

> Other Exceptions. A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to

34

meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

¶113. When a party objects to hearsay offered at trial, the trial court must determine whether the offered testimony fits one of the exceptions to the rule against hearsay. When the hearsay goes into evidence without objection, the trial court has no opportunity to evaluate the proffered testimony under M.R.E. 803(24), or any other exception. Thus, the failure to object to hearsay operates as a waiver of the issue on appeal. Rubenstein made no hearsay objection to Officer Applewhite's testimony, and therefore, his objection is procedurally barred for failure to object. *Williams*, 684 So. 2d at 1203.

¶114. When asked whether he had "any evidence to support that Mike Rubenstein didn't go pick his wife up in Texas on [November] the 17th," Officer Applewhite stated that he never knew Rubenstein went to Texas because David indicated that Rubenstein went to Mississippi to pick up the family. The trial court sustained Rubenstein's objection to the testimony. The testimony was not admitted and is therefore not an issue before this Court.

¶115. Officer Applewhite stated that, from what he remembered from the file, "I was told that it was on the 18th or 19th [of November] that Doris returned from Texas with Mike Rubenstein." Again, Rubenstein failed to object to this statement, and the issue is waived and procedurally barred on appellate review. *Moawad*, 531 So. 2d at 634.

¶116. When asked on direct examination who Officer Applewhite spoke to when ascertaining that Rubenstein was insolvent in 1993, the officer answered David and one of Doris's sisters. Rubenstein failed to object to this statement. As such, the issue is waived and procedurally barred on appellate review. *Walker*, 671 So. 2d at 597.

¶117. When asked on cross-examination if he thought Darrell or Annie could have tried to get some of the killer's tissue under their fingernails, Officer Applewhite replied that he thought of that possibility. However, he said that David told him Rubenstein bought a hypodermic needle and asked about "what type of hot-shot mix" could make someone go unconscious. Further, the officer stated another witness mentioned that Rubenstein bought hypodermic needles and threw them out along the road to Michael's wife's house.

¶118. Since Rubenstein opened the door to this testimony, any error was invited by his own question. He cannot now complain. *Caston*, 823 So. 2d at 502. Additionally, Rubenstein made no objection to the testimony, and therefore this issue is waived and procedurally barred. *Scott*, 878 So. 2d at 988.

¶119. When asked on cross-examination if he gained any information from David, Officer Applewhite stated that David was involved in insurance scams, along with Rubenstein and other family members, in Texas and Louisiana. Later, the officer stated other family members confirmed David's statements. Rubenstein failed to object to any of these answers and the issue is waived and procedurally barred. *Moawad*, 531 So. 2d at 634.

¶120. On redirect examination, the State asked Officer Applewhite what reason Bellow gave for Annie going to the cabin. The officer responded, "Annie had told Sue that they were coming . . . " At this point, Rubenstein objected on hearsay grounds. The trial court sustained the objection, and the officer never finished his response. Thus, there was no error.

¶121. Rubenstein argues that, following the above statement, Officer Applewhite again attempted to suggest motives for Annie going to Mississippi. The record reflects, however,

that Officer Applewhite never made another response on redirect examination after his answer was cut short by the trial court. Accordingly, this issue is without merit.

¶122. Rubenstein contends the State used Officer Applewhite to insinuate Doris thought her husband, Rubenstein, was responsible for the crimes. The State asked the officer whether during his conversations with Doris she "ever [gave] you any indication that she was - - held the position that those murders were not related to these insurance policies?" The officer responded, "No she didn't." Rubenstein failed to object to any of this testimony, and the error, if any, is waived on appeal. *Howard*, 507 So. 2d at 63.

*Testimony of Sheriff Glynnis*

¶123. Sheriff Glynnis testified that Dr. Ward told him the time of death was "[a]pproximately four weeks from the time we sent the bodies to Jackson." The defense did not object to this specific question. Nevertheless, the trial court later ruled this information was not in evidence and instructed the parties not to make further statements about that topic until it came into evidence. As for the sheriff's comments concerning the coroner's statement that the deaths occurred two to three weeks before December 17, the trial court sustained the objection, agreed to strike the testimony from the record, and instructed the jury to disregard it. Thus, this issue is meritless.

### VI. Whether Rubenstein received a fair trial.

¶124. Rubenstein alleges Officer Applewhite's testimony, specifically that the officer disliked anybody who hurt a child, deprived him of a fair trial. The defense objected to the statement and asked the trial court to instruct the jury to disregard it. The trial court immediately admonished the jury to disregard, saying, "you are the triers of fact. No one else

37

can take the job away from you, no matter what the witnesses say, the ultimate issue is guilt or innocence, and that is your prerogative." The trial court properly instructed the jury to disregard the statement as requested by the defense, and we find no error.

¶125. Rubenstein also takes issue with Page giving his personal opinion as to why he suspected Rubenstein. However, the record reflects the defense asked on cross-examination, "Why did you point the finger at Mike Rubenstein?" This question opened the door for the witness's response that Rubenstein was known among Page's drug connections. *See Florence v. State*, 755 So. 2d 1065, 1071 (Miss. 2000) (defense "opened the door" and put the question of Florence's potential homosexuality before the jury). This issue is therefore without merit.

### VII. Whether the evidence concerning Rubenstein's pre-arrest actions was admissible.

¶126. On appeal, Rubenstein argues his constitutional right to counsel and right to remain silent were violated. Rubenstein says Officer Applewhite provided testimony about a meeting they had on January 14, 1994, in which the officer asked Rubenstein his whereabouts on November 16 through November 18 or 19, and Rubenstein replied that he needed an attorney. Officer Applewhite testified that, after Rubenstein asked for an attorney, the questioning was stopped.

¶127. In *Riddley v. State*, 777 So. 2d 31, 34 (Miss. 2000), the defendant argued the prosecution's comments on his right to counsel were constitutionally improper. This Court stated it was problematic "to accept the proposition that a criminal defendant has a constitutionally protected right to counsel before any criminal proceedings against him have begun." *Id.* We held, "[w]hile Riddley's actions in contacting and counseling with an attorney

were probably wise, they were not constitutionally protected at the time." ***Id.    Riddley*** specifically addressed whether the prosecutor's questions on cross-examination reflected negatively on the defendant's right to counsel.  This is not the case at hand.  Here, the State did not comment on Rubenstein's decision to seek an attorney, and there was no negative connotation attached by the prosecutor.  The State's questioning focused solely on the murder investigation by Office Applewhite.  The record also reflects that Rubenstein did not object to this testimony, but even if he had, this assignment of error is meritless.

¶128. Rubenstein further contends any testimony concerning his "invocation of his right to seek legal assistance should have been barred by Rule 403," even if not prohibited by the Fifth or Sixth Amendments as discussed.  The State counters that it invited no testimony concerning Rubenstein's use of counsel or his right to remain silent.  The questions were designed solely to elicit a chronological version of the investigation, not the fact that he requested an attorney during the State's investigation.  On appeal, the State stresses that Rubenstein discovered the bodies, and he was related to the victims.  Therefore, he was a key source of information in the investigation.  The State also notes that Rubenstein fails to demonstrate that any alleged prejudice from this evidence substantially outweighs its probative value.  ***Foster v. State***, 508 So. 2d 1111, 1117 (Miss. 1987).  For the reasons stated, this assignment of error is without merit.

> **VIII.    Whether the trial court erred in refusing proposed jury instruction D-17.**

¶129. Rubenstein alleges the trial court erred in denying proposed jury instruction D-17,[15] which states, "[t]he testimony of incarcerated individuals can be looked at with some question. You have the right to accept or disregard testimony of an inmate and give it any weight you choose." This issue concerns the testimony of Stevens and Ballinger, both of whom had been incarcerated.

¶130. Rubenstein argues we should retroactively apply *Moore v. State*, 787 So. 2d 1282 (Miss. 2001), in which this Court discussed the unreliability of jail house informant, or "snitch," testimony, and reversed the trial court's denial of a cautionary instruction. *Id.* at 1287. However, in pointing out that *Moore* was decided on its particular facts, we stated that "this Court finds that the trial court erred in refusing jury instruction D-24 and that it was an abuse of discretion to deny Moore a cautionary instruction **in the face of evidence that Bully may have received favorable treatment in exchange for his testimony**." *Id.* at 1287-88 (emphasis added).

¶131. The State argues *Moore* is inapplicable and also distinguishable from this case, and that our ruling in *Manning v. State*, 735 So. 2d 323 (Miss. 1999), is dispositive. In *Manning*, this Court affirmed the denial of a cautionary instruction, stating:

> Manning was allowed to question fully both Lucious and Ashford about any potential preferential treatment which they might be receiving in exchange for their testimony. Neither witness made any deals with law enforcement or prosecutors regarding their testimony at Manning's trial . . . . This questioning satisfied the dictates of *Foster* [, 508 So. 2d at 1115].

---

[15] Jury instruction D-17 was submitted at Rubenstein's first trial. On retrial, Judge Starrett announced the instructions were considered resubmitted and stated the same rulings applied. The trial court requested the defense submit some authority to support the instruction, but it did not.

*Manning*, 735 So. 2d at 335.

¶132. Here, both Stevens and Ballinger testified that they neither received nor were promised any favorable treatment in exchange for their testimony. There is nothing to support the application of *Moore* to this case.

¶133. Additionally, Landon Phelps, the jail administrator for the Pike County Sheriff's Department during Rubenstein's first trial, also testified. During a break in the first trial, Rubenstein requested to go to the bathroom. Phelps testified that when Rubenstein came out of the restroom, the following conversation transpired:

> And when he came out, he asked me, said, Mr. Phelps, would you give me your honest opinion. . . . I said, well, I don't know whether I can legally do that or not. And he, without any further hesitation, said, well, said, do you think Stevenson's [Stevens's] testimony hurt my case. . . . And he said, well, I told him what went on up there at Summit, but I didn't know he was going [sic] turn it into a confession. And that ended that conversation.

Thus, Phelps's testimony provides reliability for Stevens's assertion that he and Rubenstein discussed the murders. Based on the record, we find the trial court did not err in denying proposed jury instruction D-17.

**IX.    Whether there was reversible error in Ballinger's unsolicited comment regarding his offer to take a polygraph.**

¶134. Rubenstein alleges he is entitled to a new trial because Ballinger stated that he offered to take a polygraph test. However, this issue is both procedurally barred and without merit.

¶135. In *Weatherspoon v. State*, 732 So. 2d 158, 163 (Miss. 1999), this Court held the inadvertent admission of evidence pertaining to a witness's offer to take a polygraph test or the mention of a witness's refusal to take a polygraph test does not automatically demand reversal. The nature of the admission and the circumstances attendant to its disclosure must be

41

considered. *Id.* Unlike the facts in *Weatherspoon*, neither the State nor the defense solicited Ballinger's testimony regarding the polygraph test. Ballinger merely interjected that his offer to take a polygraph test was declined. Furthermore, neither party objected to his testimony. *See Williams*, 684 So. 2d at 1203 (contemporaneous objection rule applies in death penalty cases). Reviewing the circumstances of the disclosure, and noting that Rubenstein made no objection, the issue is without merit.

## X. Whether the State knowingly presented false testimony.

¶136. Rubenstein next argues the State knowingly presented false expert testimony or allowed a false impression of the evidence to be presented to the jury. Rubenstein takes issue with the testimony of the State's expert, Dr. William Bass, a forensic anthropologist, who was used to establish a date of death. We have held, "'[a] new trial is required if the false testimony could have . . . in any reasonable likelihood affected the judgment of the jury.'" *Manning v. State*, 884 So. 2d 717, 726 (Miss. 2004) (quoting *Barrientes v. Johnson*, 221 F.3d 741, 756 (5th Cir. 2000) (citing *Giglio v. United States*, 405 U.S. 150, 154, 92 S. Ct. 763, 31 L. Ed. 2d (1972); *Napue v. Illinois*, 360 U.S. 264, 271, 79 S.Ct. 1173, 3 L. Ed. 2d 1217 (1959)).

¶137. During the State's case-in-chief, Dr. Bass testified that he estimated it took blowflies a week to ten days to realize dead people were in the cabin and to get to the bodies. He also stated that developing such an estimate is not an exact science. On cross-examination, Dr. Bass testified the flies would have gotten to the bodies in eight to ten days. Dr. Bass acknowledged that he had not been to the cabin to examine the ease of access to its interior. He testified that he did not see any pupal cases (which would indicate the maggots had left the bodies) in the photographs and reports he had reviewed to that point. He testified that in crime

42

scene pictures, it is often difficult to see the maggot masses because maggots are attracted to blood and moist areas of the body.

¶138. After Dr. Bass testified, the defense called a number experts. Dr. Mark Krouse, a forensic pathologist, estimated "around ten to twenty days [passed] from the time they died to the time they were discovered." Dr. Lamar Meeks, an entomologist, testified the family had been dead about ten days to two weeks before they were discovered. Dr. Neil Haskell, another entomologist, estimated the flies began their life cycle no earlier than December 2, 1993, if there was no heat in the cabin, and December 9, 1993, if there was heat. Dr. Ward, a forensic pathologist, testified that due to the bodies' decomposition, it would be impossible to pinpoint a precise date of death. She acknowledged that she had no specific knowledge of entomology, but she testified that she saw maggots of varying sizes. Dr. Ward estimated the victims had not been dead for more than two weeks before they were discovered.

¶139. The State recalled Dr. Bass on rebuttal. Dr. Bass testified that the flies' infiltration of the cabin would have taken "a few days to more than a few days." On rebuttal, Dr. Bass stated that pupa casings could be seen in Dr. Ward's autopsy photographs, and he referenced Dr. Ward's testimony that she observed multi-generation maggots. Therefore, Dr. Bass incorporated the testimony of Dr. Ward and her autopsy photographs into his testimony. The defense made no objection, and the defense did not question Dr. Bass on cross-examination as to any correction of his earlier testimony regarding the presence of pupa casings.

¶140. The State argues the substance of Dr. Bass's testimony remained virtually the same on both occasions. On direct, Dr. Bass indicated "there was decay there before the maggots got there," and the entomologists' reports did not take into account that the bodies were "decaying

43

and then the insects" arrived. Similarly, on rebuttal, Dr. Bass testified that the entomologists failed to "consider that the body is decaying before the maggots get there" based on the physical barriers to the bodies. He stated, "[t]he entomologists are giving you a minimum time from the time that the insects attack the body until the body is found."

¶141. Furthermore, the State asserts that Dr. Bass's rebuttal testimony regarding seeing pupa casings was not the only evidence of the existence of pupa casings in the record. The State points to statements by Officer Applewhite and the Coroner, Percy H. Pittman, Jr., that they heard what sounded like "rice crispies" when they walked through the cabin. Additionally, one of the State's experts explained that "lay remarks about 'rice crispies' [are] a very common observation by law enforcement, where pupa casings are present." Finally, certain photographs in Exhibit 47 clearly indicate the presence of pupa casings in Krystal's hair.

¶142. The jury heard the testimony from all the experts, and no one pinpointed the same time of death. Rubenstein asks this Court to find that the State knowingly had Dr. Bass present false testimony on rebuttal to salvage its case, but the record does not support this allegation. The defense never asked Dr. Bass to explain his change in opinion as to the pupa casings or to clarify what pictures he looked at before he testified on direct or on rebuttal. This Court has repeatedly held that "[t]he jury is the final arbiter of a witness's credibility." *Williams v. State*, 794 So. 2d 1019, 1028 (Miss. 2001) (citing *Morgan v. State*, 681 So. 2d 82, 93 (Miss. 1996)). Dr. Bass's credibility as a witness rested with the jury.

¶143. Nothing in the record supports Rubenstein's bold assertion that the State intentionally presented false testimony. In fact, the defense has not demonstrated that Dr. Bass's testimony

44

was actually false. His opinion testimony was provided as an expert and open to cross-examination. We find this assignment of error is without merit.

### XI. Whether the trial court properly admitted rebuttal evidence, and whether there was a discovery violation.[16]

¶144. Rubenstein argues the State violated its discovery obligations by failing to disclose Dr. William Rodriguez as a prosecution witness before trial. Dr. Rodriguez, a forensic anthropologist, testified as a rebuttal witness for the State.

¶145. The record reflects the State listed Dr. Rodriguez as a potential witness on its witness list filed in the circuit clerk's office on December 29, 1999, and indicated he would be called to testify as a M.R.E. 702 expert. Dr. Rodriguez's name and telephone numbers were also provided. Furthermore, at the pre-trial hearing on January 7, 2000, the State informed the trial court that Dr. Rodriguez would be called as an expert to set the approximate date of death at November 16, 1993. On January 14, 2000, the State furnished a letter to the defense setting forth Dr. Rodriguez's findings, in compliance with the trial court's instructions, and stating he would be called as a rebuttal witness. Clearly, Rubenstein's claim that the State did not satisfy its discovery obligation is meritless.

¶146. Rubenstein also argues that rebuttal testimony cannot be used to avoid the obligation to disclose evidence about the State's case-in-chief, and that Dr. Bass and Dr. Rodriguez presented improper rebuttals. However, the record does not support this allegation.[17]

---

[16] This issue is a continuation of Issue X, which discussed Dr. Bass's rebuttal testimony. However, the defense briefly mentions Dr. Bass in its argument that Dr. Rodriguez's rebuttal was improper and constituted a discovery violation. Therefore, we focus on Dr. Rodriguez in this issue.

[17] Dr. Bass's testimony on rebuttal is fully discussed in Issue X. To avoid repetition, it will not be restated here.

45

¶147. Dr. Rodriguez testified that decomposition is a complex subject and entomology cannot be looked at alone. He noted the bodies being indoors makes estimating time of death less accurate. While he testified that insects may have been in the cabin for the length of time estimated by Rubenstein's experts, he concluded the bodies had been in the cabin for three to four weeks before they were discovered on December 16.

¶148. Dr. Rodriguez testified that the pictures of Krystal's body showed pupa casings in her hair, on the sheet she was wrapped in, and along her neck. However, he stated the existence of pupa casings was not the dispositive factor in formulating his "opinion on the decompositional process, which is a more gross visualization." He testified that he based his time of death estimate "on the environmental conditions and corporal evidence that we use in a combined manner to get the estimate that combines all of those aspects."

¶149. The defense never objected to Dr. Rodriguez's testimony regarding pupa casings as improper rebuttal or a discovery violation. *See Scott*, 878 So. 2d at 988 (failure to object waives error). Procedural bar aside, based on the discussion in Issue X, Dr. Rodriguez's and Dr. Bass's testimony were proper rebuttals.

¶150. This Court "has encouraged liberal application of the rebuttal evidence rule. . . . The determination of whether evidence is properly admitted as rebuttal evidence is within the trial court's discretion." *Powell v. State*, 662 So. 2d 1095, 1098-99 (Miss. 1995) (citations omitted). Likewise, in *McGaughy v. State*, 742 So. 2d 1091, 1095 (Miss. 1999), a capital murder case, we reiterated our support for a liberal application of the rebuttal evidence rule, stating, "[t]he time and manner of introducing evidence is committed to the sound discretion of the trial judge." Accordingly, we "will not reverse unless the exercise of discretion appears

46

arbitrary, capricious or unjust." *Id.* There is no evidence to support Rubenstein's claim the trial court abused its discretion in allowing the rebuttal testimony. This issue is without merit.

### XII. Whether there was a *Brady* violation.

¶151. Rubenstein briefly asserts the State failed to discharge its duty pursuant to ***Brady v. Maryland***, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), which controls the disclosure of exculpatory information. Rubenstein argues that, because Dr. Rodriguez's testimony that he saw pupa casings differed from Dr. Bass's testimony, it amounted to exculpatory evidence that should have been disclosed. In presenting this assignment of error, Rubenstein does not tell the complete story.

¶152. In his rebuttal testimony, Dr. Bass stated that he reviewed the autopsy photographs and heard Dr. Ward's testimony regarding her autopsy. Based on that information, Dr. Bass corrected his earlier testimony, stating pupa casings **could** be seen in the autopsy photographs. Dr. Rodriguez's testimony, offered to rebut the testimony of Rubenstein's experts, similarly provided that pupa casings could be observed in the photographs.

¶153. There is no indication the defense did not have access to the photographs, and the defense had experts to testify as to whether they observed pupa casings. Rubenstein's argument centers on an alleged inconsistency between Dr. Bass's and Dr. Rodriguez's testimony. However, the "inconsistency" is easily explained, and Rubenstein does not demonstrate the factors necessary to support a ***Brady*** claim or a new trial. *See **Brady***, 373 U.S. at 87. In addition, the defense did not cross-examine Dr. Bass, and it never objected to Dr. Bass's testimony about pupa casings. ***Scott***, 878 So. 2d at 988 (failure to object waives error). Therefore, this assignment of error is without merit.

## XIII. Whether Instruction 15 (defining "felonious child abuse") was constitutional and supported by the evidence.

¶154. Rubenstein next argues the jury was improperly instructed on the elements of felonious child abuse. Specifically, Rubenstein claims the instruction was unconstitutionally vague and not supported by the evidence. The State correctly points out that Rubenstein did not raise an objection to the felonious child abuse instruction at trial. Therefore, this issue is procedurally barred. *See Williams*, 684 So. 2d at 1203.

¶155. Although the issue is procedurally barred, we will briefly address the merits of Rubenstein's challenge to the instruction. Rubenstein contends the instruction was inadequate and not supported by the evidence. Instruction 15 stated, "[u]nder the laws of the State of Mississippi, felonious child abuse is defined as intentional torture in such a manner as to cause serious bodily injury or the death of any child." Miss. Code Ann. Section 97-5-39(2)(a) provides:

> Any person who shall intentionally (i) burn any child, (ii) torture any child or, (iii) except in self-defense or in order to prevent bodily harm to a third party, whip, strike or otherwise abuse or mutilate any child in such a manner as to cause serious bodily harm, shall be guilty of felonious abuse of a child . . . .

Jury Instruction 15 accurately tracks the language of the felonious child abuse statute. "[T]his Court has 'consistently held that instructions in a criminal case which follow the language of a pertinent statute are sufficient.'" *Byrom v. State*, 863 So. 2d 836, 880 (Miss. 2003) (quoting *Crenshaw v. State*, 520 So. 2d 131, 134 (Miss. 1988)).

¶156. Furthermore, the language of Section 97-5-39(2)(a) is not vague. The statute provides "a person of ordinary intelligence a reasonable opportunity to know what conduct is prohibited." *Faraga v. State*, 514 So. 2d 295, 303 (Miss. 1987). Moreover, this Court has

48

held that "'the intentional act of murdering a child by any manner or form constitutes felonious child abuse and, therefore, constitutes capital murder under Miss. Code Ann. § 97-3-19(2).'" *Brawner v. State*, 872 So. 2d 1, 16 (Miss. 2004) (quoting *Stevens v. State*, 806 So. 2d 1031, 1044 (Miss. 2001)). Therefore, Instruction 15 was not unconstitutional.

¶157. According to Dr. Hayne's testimony, four-year-old Krystal would have experienced panic and terror while being strangled. Additionally, Dr. Hayne said she would have experienced "pain and suffering from compression of those structures of the neck, not only light[-]headedness, but certainly air starving and the like."

¶158. Furthermore, Krystal was discovered nude on a bed with her legs spread open. The State submits that Krystal's state of undress and location cannot be totally disregarded. In *Brown v. State*, 690 So. 2d 276, 281 (Miss. 1996), Dr. Hayne, the forensic pathologist, found no evidence of sexual assault. However, the victim was found nude with her bra pulled behind her head, and the girl's wounds indicated abuse. *Id.* We stated:

> Although it was not necessary to prove sexual battery or rape, evidence supporting the State's theory that Brown went to the Boyd house to have sex with Evangela is not totally irrelevant. While Dr. Hayne, the forensic pathologist, found no evidence of sexual assault, the girl's body was discovered nude with her bra pulled behind her head. Her wounds indicate that she had been abused, struck and mutilated consistent with the definition of felonious abuse and/or battery of a child provided in § 97-5-39.

*Id.* at 291.

¶159. The State also asserts that, based on expert testimony, it is reasonable to infer that Krystal may have witnessed her parents' murders before her death. Both Darrell and Annie had multiple stab wounds, and both Dr. Hayne and Dr. Bass testified all three were killed at roughly the same time.

49

¶160. We cannot say Instruction 15 was unsupported by the evidence. Thus, we find this assignment of error is without merit.

**XIV. Whether the trial court properly instructed the jury on the only definition of capital murder, and whether the verdict was clearly unanimous.**

¶161. Before discussing Issues XIV through XVIII, we note that Rubenstein's theory of the case centered on the assertion that he could not have killed three people at once. This theory, which will be discussed *infra*, forced the State to request alternate jury instructions.

*Unanimous verdict*

¶162. Rubenstein argues Instructions 5 and 15 allowed the jury to convict him without making a unanimous finding in violation of his due process rights. He also contends the jury instructions supported different theories of capital murder, those being murder during the commission of the crime of felonious child abuse, murder for hire, or acting as an accomplice, aider, or abetter.[18] Instruction 5 states, in part:[19]

---

[18] In Issue XIII, we addressed the felonious child abuse issue. Issues XVI and XVII go into more detail on aiding and abetting. We have held that "one who aids and abets another in the commission of an offense is guilty as a principal." ***King v. State***, 857 So. 2d 702, 739 (Miss. 2003).

[19] The trial court refused an alternate jury instruction which contained specific aiding and abetting language. This instruction was labeled as instruction S-5 (also known as S-4). The refused instruction provided:

> The Court instructs the Jury that every person who assists, aid or abets, arranges for, counsels or commands another in the commission of a crime is equally as guilty as if he had committed entire [sic] crime by himself. Therefore, if you the jury find beyond a reasonable doubt that Alan Michael Rubenstein participated by aiding, abetting, arranging, counseling or commanding another in the murders as alleged in counts one, two and three, you may find him guilty even though you may suspect that some other person also participated in the murders.

50

Therefore, the Court instructs the Jury that if you believe from the evidence in this case, beyond a reasonable doubt, that Krystal Ryan Perry, Evelyn Anne Perry and Darryl Perry were murdered as defined in other instructions from the Court, and further believe beyond a reasonable doubt that the defendant, Alan Michael Rubenstein, arranged for, counseled, assisted or commanded another to commit the murders, if any, then you may find the defendant, Alan Michael Rubenstein, guilty as charged.

Instruction 15 states, in part:

The Court instructs the jury that Alan Michael Rubenstein has been charged in Count One of the indictment with the capital murder of Krystal Ryan Perry on or about the 16th day of November, 1993. Therefore, if you find from the evidence in this case beyond a reasonable doubt that on or about the 16th day of November, 1993, in Pike County, Mississippi, the defendant, Alan Michael Rubenstein, did wilfully, unlawfully, feloniously and of his malice aforethought, either alone or in cooperation with another kill and murder Krystal Ryan Perry, a child, by intentionally committing acts which resulted in the torture of the said Krystal Ryan Perry, then you should find the defendant guilty of capital murder.

¶163. The record reflects Rubenstein failed to object to Instructions 5 and 15 on the basis that the jury would be able to convict him without a unanimous verdict in violation of his due process rights. Accordingly, this issue is procedurally barred on appellate review. *Carter*, 722 So. 2d at 1261 (objection on one ground waives all other grounds on appeal). Despite the procedural bar, we will briefly address this issue on the merits.

¶164. A number of instructions required the jury to reach a unanimous verdict. Instruction 17 states, in part, "[t]he Court instructs the Jury that before you can reach a verdict in this case, all twelve of you must agree upon the same verdict. This means that any verdict of the Jury must be unanimous." Instruction 16 reads, in part, "[t]he verdict of the jury must represent the considered judgment of each juror. In order to return a verdict, it will be necessary that each juror agree. In other words, all twelve jurors must agree before returning a verdict in this case." These instructions make it clear that the twelve jury members were required to reach

51

a unanimous verdict, which they did. The trial court also polled the jury, finding the verdict to be unanimous. Rubenstein's claim that the instructions allowed the jury to convict him without a unanimous verdict is meritless.

*Murder for hire*

¶165. Furthermore, the record reflects that Rubenstein did not object to the instructions based on perceived "murder for hire" language. Therefore, this issue is procedurally barred. ***Walker***, 671 So. 2d at 597.

¶166. Rubenstein's complaint is also without substantive merit. Instruction 5 contains no language indicative of a murder for hire instruction. The "murder for hire" provision states, "that capital murder includes a murder that is perpetrated by any person who has been offered or has received anything of value for committing the murder, and all parties to such a murder, are guilty as principals." Miss. Code Ann. § 97-3-19(2)(d). The instructions contain no language similar to the statute and cannot be considered "murder for hire" instructions.

*Aiding and abetting*

¶167. Instruction 5, as the State admits, contains language that is essentially an aiding and abetting instruction. *See **King***, 857 So. 2d at 727-28. However, as explained in Issues XVI and XVII, *infra*, Rubenstein's theory of the case necessitated an instruction including the "arranged for, counseled, assisted or commanded another" language. The trial court did not err in giving either Instruction 5 or 15 to the jury. For all these reasons, this assignment of error is without merit.

52

**XV. Whether Instruction 5 constructively amended the indictment.**

¶168. Rubenstein argues Instruction 5 constructively amended the indictment by allowing the jury to convict him for murder for hire pursuant to Miss. Code Ann. Section 97-3-19(2)(d). The grand jury indicted Rubenstein for capital murder while engaged in the commission of felonious child abuse in violation of Miss. Code Ann. Section 97-3-19(2)(f).

¶169. As explained in Issue XIV, the record reveals that Rubenstein never objected to Instruction 5 on the basis of it being a murder for hire instruction. Likewise, he never objected to the instruction as constructively amending the indictment. *Moawad*, 531 So. 2d at 634 (failure to object waives error). Thus, the issue is procedurally barred.

¶170. Additionally, Rubenstein's argument is wholly without substantive merit. As previously addressed in Issue XIV, the language of Section 97-3-19(2)(d) concerning murder for hire is not contained in any of the jury instructions. Accordingly, we find the issue is procedurally barred and also without substantive merit.

**XVI. Whether Instruction 15 was supported by the evidence.**

¶171. Rubenstein argues there was no evidence to support jury Instruction 15 which, in pertinent part, stated:

> Therefore, if you find from the evidence in this case beyond a reasonable doubt that on or about the 16th day of November, 1993, in Pike County, Mississippi, the defendant, Alan Michael Rubenstein, did wilfully, unlawfully, feloniously and of his malice aforethought, either alone or in cooperation with another kill and murder Krystal Ryan Perry . . . .

¶172. The proposed Instruction 15 had stated, "either alone or in cooperation with another **with whom he was then and there aiding and abetting**." Defense counsel objected, stating the evidence did not support the instruction. The trial court agreed to take out the language,

53

"with whom he was then aiding and abetting," finding the instructions had "to comply or comport with the proof and the reasonable inferences therefrom." This Court has held, "[i]nferences and presumptions are a staple of our adversary system of fact finding. It is often necessary for the trier of fact to determine the existence of an element of the crime - that is, an 'ultimate' or 'elemental' fact - from the existence of one or more 'evidentiary' or 'basic' facts." *Edwards v. State*, 469 So. 2d 68, 70 (Miss. 1985).

¶173. Rubenstein's argument that the "alone or in cooperation with another" language was unsupported and improperly submitted to the jury is without merit. The defense's theory of the case was that someone else killed Annie, Darrell, and Krystal because Rubenstein could not have murdered the three people alone. In his opening statement, defense counsel stated:

> How does one person murder three people? You can imagine the mother of a child, while Daryl is being stabbed and his throat cut from the front to the back of his neck, she would be grabbing her child, fighting for her life and her child's life, and getting out of the cabin, screaming, yelling breaking open windows, breaking doors trying to get out, yet she has not one defensive stab wound. It is impossible for it to have happened that the way the State claims. It raises the reasonable question that these victims may not have been murdered in this cabin.

¶174. Furthermore, the defense questioned Lisa French about observing a green mini-van in front of the cabin. French testified that she saw a young man and a little girl walking around the cabin on November 12, 1993. She saw the same young man and a little girl outside playing on the front porch three or four days later. On cross-examination by the State, French testified that she could not be exact about when she saw the green van, but it was less than a week later. Likewise, on cross-examination of Dr. Bass, the defense asked if flies could have attached themselves to the bodies while the bodies were being unloaded from a van. Moreover, Stevens

54

testified that Rubenstein told him that he had planned to have someone else commit the crimes, but he changed his mind.

¶175. The defense's theory and the evidence presented adequately support the trial court's instruction. Therefore, this issue is meritless.

### XVII. Whether Instruction 15 was proper.

¶176. Rubenstein also argues Instruction 15 improperly allowed the jury to convict him based on nothing more than some sort of "cooperation" with another person. As previously stated in Issue XIV, the instruction included aiding and abetting language, and when all of the instructions are read together, the jury was properly instructed. This Court has stated, "'[j]ury instructions are to be read together and taken as a whole with no one instruction taken out of context.'" *Humphrey v. State*, 759 So. 2d 368, 380 (Miss. 2000) (quoting *Heidel v. State*, 587 So. 2d 835, 842 (Miss. 1991)). *See also Austin v. State*, 784 So. 2d 186, 193 (Miss. 2001). Here, "[t]he instructions, when considered in conjunction with all others, had no tendency to mislead or confuse the jury . . . ." *King*, 857 So. 2d at 728. Instruction 15 was proper, and this assignment of error is without merit.

### XVIII. Whether the trial court erred in refusing to strike the venire.

¶177. Rubenstein argues the trial court denied him a fair trial by refusing to strike the venire, and this error, he contends, requires reversal of his conviction and sentence.

¶178. First, Rubenstein claims he was prejudiced by information overheard by members of the jury pool. Juror Woodward informed the trial court that she had overheard an unknown excused juror tell Juror Saucier "that the case had been overturned before and that the man had committed heinous crimes and that they were trying to get a big jury pool so the lack of a jury

– jurors could not be used again to overturn the case." Rubenstein argued that jurors heard information that the case was "overturned on a technicality," but the trial court correctly stated that Juror Woodward did not hear such a comment.

¶179. Rubenstein also voiced concern that an indeterminate number of jurors heard the crimes described as "heinous." The trial court did not find that any other juror had knowledge of the case.[20] The only evidence in the record is that Juror Woodward, Juror Saucier, and an unknown excused juror heard the information at issue, and none of these persons served on Rubenstein's jury. Additionally, every juror stated that he or she could be fair and impartial. We find that Rubenstein was not prejudiced by the information, as none of these three potential jurors sat in judgment of his case. The trial court did not err in refusing to strike the venire, so this issue is without merit.

¶180. Rubenstein also contends that when the trial court addressed the jurors and told them the first trial resulted in a mistrial, the judge allegedly said one of the murders "involv[ed] child abuse." Rubenstein claims the trial court's comments compounded the prejudice against him and "amount[ed] to a judicial finding that the murder involved child abuse."

¶181. Rubenstein's complaint arises from the following statement by the trial court: "What you may have speculated, first of all it is a serious case. You've just heard, it involves alleged three deaths, alleged to be three murders. One involving child abuse. That is, in and of itself, very serious matters [sic]." From the context of the statement, it is clear the trial judge meant that the State **alleged** one of the murders involved child abuse, not that the trial court **found**

---

[20] Juror McQueen thought she had heard of the case in the newspaper, but the trial court did not believe there was such an article. Nevertheless, Juror McQueen stated she would "certainly, try to base [the verdict] on the evidence.

child abuse. Accordingly, we find that Rubenstein has mischaracterized the trial court's comments and has taken them out of context. Therefore, this issue is without merit.

### XIX. Whether the State's closing arguments at the guilt phase of the trial were proper.

¶182. Rubenstein argues that, in closing argument, the State improperly commented on his exercise of the rights not to testify and to assistance of counsel, misstated applicable law, expressed a personal opinion as to the credibility of witnesses, and referred to facts not in evidence. The record shows the following transpired during the State's closing argument:

| | |
|---|---|
| State: | Did Mr. Rubenstein ever acknowledge this statement as being his? Well, sure he did, ladies and gentlemen. Remember what happened, what Officer Applewhite and Don Lindley testified happened at Wally Beaver's [sic] office in New Orleans. . . . [T]hey were told that Mr. Rubenstein had given his statement on the 16th of December - - |
| Defense: | Objection. We went over this. Mr. Rubenstein never gave a statement. That has been mischaracterized through nine days of this trial, and he is up there doing it again. And I would like that clarified now. That was an interview. |
| Court: | Overruled. |

¶183. Rubenstein's objection at trial was that the State mischaracterized his interview as a "statement." However, on appeal, he claims the State improperly remarked on his exercise of the rights not to testify and to seek assistance of counsel. Thus, this assignment of error is procedurally barred. *Carter*, 722 So. 2d at 1261 (objection on one ground waives all other grounds on appeal). Furthermore, the State's remarks did not concern Rubenstein's failure to testify, but rather demonstrated that Rubenstein stood by his account of events given on December 16. The State's remarks conformed to the evidence admitted at trial.

¶184. Rubenstein further argues the State commented on his exercise of the right not to testify when the State remarked, "[t]here is absolutely no evidence to the contrary but that Mr. Rubenstein got that money in cash." Again, the State's comment was based on the evidence admitted at trial, not on Rubenstein's choice not to testify.

¶185. Hiene, the insurance agent, testified that Rubenstein and his wife came to his office after the bodies were discovered to collect on Krystal's life insurance policy. $60,000 of the proceeds were assigned to Attorney Wiley Beevers, and the balance was disbursed to Doris. Officer Applewhite subpoenaed the Hibernia National Bank, and its records showed withdrawals of $63,100 and $57,500 in cash on May 16, 1994, and May 20, 1994, respectively. The officer also obtained cash transaction reports from the Federal Reserve System, which contain information on cash transactions over $10,000. The officer testified he was able to ascertain that Rubenstein ultimately received the bulk of the proceeds from the insurance policy on Krystal. He also discovered that Rubenstein was insolvent in November 1993. The evidence supports the State's comment in closing argument, and the remarks were proper. *Bell v. State*, 725 So. 2d 836, 851 (Miss. 1998) (prosecutor may comment upon any facts introduced into evidence and draw whatever deductions seem proper from those facts).

¶186. Rubenstein also argues the State improperly referred to him as "manipulative." First, the defense failed to make a contemporaneous objection at trial. Therefore, this assignment of error is procedurally barred. We have held, "[i]t is incumbent on defense counsel to raise proper objection when offensive language is uttered or waive appellate review of issue." *Foster*, 639 So. 2d at 1288-89.

¶187. Second, Rubenstein's claim has no merit. The complained of remarks occurred during the State's rebuttal closing argument:

> My oath would require me to frankly sack Mr. Goodwin if I thought he was manipulating a witness. And I can't get carried away with the tragedy of the situation. Neither can I be manipulated by the defendant, and allow him to put the State in the position that we cannot ask the jury for justice. And so that's what this trial is about. It's about whether or not the defendant has manipulated the system to the point that you cannot find under your oaths that he is guilty beyond a reasonable doubt.
>
> * * *
>
> Where was [Tonya Rubenstein] when she gave her first statement that she had seen Annie at Gatsby's, where was she? She was at Uncle Mike's house. . . . The second time she gave a statement, to the lawyer, how did she get there? . . . Uncle Mike took her there. Now, has Uncle Mike ever been manipulative before, has he ever called upon his family members to go to a lawyer's office and lie? Obviously. Numerous occasions.

¶188. The State contends the remarks were made in response to numerous comments by the defense in its closing argument accusing the State of manipulating the jury. "In order to make an appropriate assessment, the reviewing court must not only weigh the impact of the prosecutor's remark, but must also take into account defense counsel's opening salvo." *Simmons*, 805 So. 2d at 490. The State can properly rebut the defense's arguments when the defense invites such a response. *Davis v. State*, 660 So. 2d 1228, 1255 (Miss. 1995). Some of the defense's comments in its closing were as follows:

> You [the jury] know when somebody is trying to twist the facts. I'm not deliberately going to do that. I'm not saying the State didn't do it, but I'm telling you I'm not going to do it.
>
> * * *
>
> And I don't mean that these witnesses are dishonest. . . . I'm just saying they have another agenda. . . . And Mr. Goodwin [Assistant District Attorney] can't be judge, jury and executioner.
>
> * * *

59

[Defense Co-counsel Janous] told you that the State was desperate, and in their desperation they've stooped to the lowest level of going to jails and dealing with convicted felons.

* * *

You see how some things can be manipulated? Ms. Janous told you their case was about manipulation of the facts, in her opening statement, if you recall it. She was right on the money. They manipulate every date.

* * *

But I do care if a man [Officer Applewhite] is biased when he's closing a case. You'd care too. Because when they're biased, they start to manipulate things.

* * *

Strong, hard facts, backed up medically and scientifically, each and everything that we put there. Not talking, but producing. . . . She [Janous] said we will produce hard facts for you, not a bunch of bologna to try to get you prejudiced.

* * *

[T]hey somehow or another maneuver Ms. Loque to come up here on the stand and say that she called Doris Rubenstein on November 16th. . . . Take the witness in the room and explain the dates-give this date. And then they bring them out here and the dates are messed up.

¶189. In its closing argument, the defense clearly made an issue of the State allegedly manipulating the case against Rubenstein, the evidence, and the witnesses. Therefore, we find the State's remarks in response were not improper.

¶190. Rubenstein also argues that the District Attorney expressed personal opinions about witnesses in the State's rebuttal closing argument. The record reflects that of the excerpts cited by Rubenstein, the defense made no contemporaneous objections. In *United States v. Young*, 470 U.S. 1, 20, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985), the United States Supreme Court stated that bolstering statements made by the prosecution do not amount to plain error as to require reversal. As the defense did not raise any objection to preserve this assignment of error for appellate review, it is procedurally barred.

¶191. Procedural bar notwithstanding, the defense invited the State's response in rebuttal by its repeated attacks on the credibility of the State's witnesses and on the State itself. *See*

60

***Young***, 470 U.S. at 17-18 (any potential harm was mitigated because the jury understood "the prosecutor was countering the defense counsel's repeated attacks on the prosecution's integrity . . . ."). *See also* ***Simmons***, 805 So. 2d at 490; ***Davis***, 660 So. 2d at 1255.

¶192. Finally, Rubenstein argues the State referenced matters not in evidence, citing to the following excerpt from the State's closing argument:

> [T]he two foremost experts in the world - - Dr. Bass and Dr. Rodriguez, the people who pioneered the study of decaying bodies, decaying human bodies - - that these two men are absolutely, just had no question that these bodies had been there for several weeks. And while I'm on December the 2nd, let's talk about Tonya for a moment.
>
> Tonya Rubenstein stated and testified to you that the very first time that she told anyone about having seen Annie at Gatsby's on December 2nd, was at the funeral home when the death certificates had come out [,] . . . placing the deaths at November. And she said, oh, that can't be true, because I saw her at Gatsby's. And she said that was the first time she had mentioned to anyone that fact.
>
> Well, ladies and gentlemen, the funerals, I think that we can assume, were after the bodies were found. The bodies were found on December 16, 1993. And yet, in Mr. Rubenstein's interview or statement or whatever you want to call it, he said that Tonya had seen them at Gatsby's. . . . I mean, someone is just not telling the truth at that point.

¶193. Again, the defense raised no objection, so the assignment of error is procedurally barred. ***Moawad***, 531 So. 2d at 634. Procedural bar notwithstanding, the State's remarks were related to the evidence introduced. Dr. Rodriguez's testimony included questioning by the defense on rebuttal cross-examination and by the State on redirect as to an eyewitness seeing Annie alive on December 2, 1993. On cross-examination, the State questioned Tonya Rubenstein as to discrepancies in her testimony concerning seeing Annie on December 2.

61

¶194. While the assignment of error is procedurally barred, we alternatively find the State's closing argument conformed to the evidence and reasonable inferences drawn therefrom. Therefore, this assignment of error is without merit.

### XX. Whether the trial court erred in handling the State's objections to defense counsel's closing arguments at the guilt phase of the trial.

¶195. Rubenstein argues the trial court erred in sustaining three of the State's objections to the defense's closing argument. The first assignment of error arises from the defense's comment that "Doris and David Rubenstein could have testified by the State. They don't want them here." The trial court interjected that the defense's comment was a misstatement because the witnesses were equally available to both sides. However, defense counsel continued his argument, stating Rubenstein is presumed innocent, the defense does not have to call witnesses, and the State should have called Doris rather than reporting what she said.

¶196. Rubenstein argues the trial court's statement "amounted to an improper comment on the defendant's burden at trial." However, he cites no authority for this proposition, so the issue is procedurally barred. *Bell v. State*, 879 So. 2d 423, 434 (Miss. 2004) ("Failure to cite relevant authority obviates the appellate court's obligation to review such issues.").

¶197. Procedural bar notwithstanding, this issue is without substantive merit. The record reflects Rubenstein made his argument to the jury despite the State's objection. Moreover, the defense opened the door for the objection and the trial court's ruling. We have held that "'the failure of either party to examine a witness equally accessible to both is not a proper subject for comment before a jury by either of the parties.'" *Griffin v. State*, 533 So. 2d 444, 449 (Miss. 1988) (quoting *Phillips v. State*, 183 So. 2d 908, 911 (Miss. 1966)).

¶198. Rubenstein next claims the trial court erred in sustaining the State's objection to the defense's comment that "[n]ow the State's case is totally based upon and they are permitted and they are mandated to prove November 16, 1993." This assignment of error is without merit because the defense's assertion is factually incorrect. In **Dennis v. State**, 555 So. 2d 679, 684 (Miss. 1989), this Court held that "it is the duty of the trial counsel to promptly make objections and to insist upon a ruling by a trial judge if he deems opposing counsel to be overstepping . . . ." Here, the indictment provided the crimes occurred "**on or about** the 16th day of November, 1993 . . . ." (Emphasis added). Furthermore, neither side's experts could pinpoint an exact date of death. For these reasons, the issue is meritless.

¶199. Finally, Rubenstein argues the trial court erred in sustaining the State's objection to the defense's closing remarks regarding the hairs discovered. Rubenstein also takes issue with the trial court's allegedly improper comments regarding the relevancy of the tests. The record reflects the defense was discussing the hair tests requested by the parties in the first trial versus the second trial. In sustaining the State's objection, the trial court reasoned, "[t]hat is outside the scope of the proof." Despite, the trial court's ruling, the defense continued to discuss the various tests.[21]

¶200. Rubenstein fails to demonstrate how the defense was hindered or the trial "infected" by the trial court's ruling. While the trial court sustained the State's objection, the defense proceeded with its closing argument, pointing to each test done by the State. The defense continued to refer to the first trial, the availability of testing on the hairs, and the stipulation that the hairs did not belong to Rubenstein. We find the trial court did not err in ruling the

---

[21] Issue XXII addresses the testing that was requested and its availability to either side.

63

defense's closing argument was outside the scope of the evidence introduced. Moreover, any error in the trial court's ruling is harmless because Rubenstein nonetheless made his argument regarding the hairs to the jury. This assignment of error is without merit.

**XXI. Whether the trial court erred in denying Rubenstein's requests for exhumation of the victims' bodies and DNA tests.**

¶201. Before both his first and second trial, Rubenstein requested the victims' bodies be exhumed in order to collect fingernail scrapings for DNA testing. Rubenstein also requested that hairs found at the scene of the crime near Krystal's body be tested for DNA. The trial court refused to provide the funds for the exhumations and testing. Rubenstein claims the exhumation and DNA testing would provide critical evidence to assist in his defense. Therefore, Rubenstein requests his conviction be reversed.

¶202. This Court has held that the "[d]etermination of whether the State must pay for an expert witness for an indigent defendant must be made on a case by case basis." *Coleman v. State*, 697 So. 2d 777, 782 (Miss. 1997) (citing *Davis v. State*, 374 So. 2d 1293, 1297 (Miss. 1979)). We have also held that "DNA evidence is not always valuable enough to warrant a trial delay." *Coleman*, 697 So. 2d at 782 (citing *Rhymes v. State*, 638 So. 2d 1270, 1274 (Miss. 1994)). Given the expense and time required to conduct DNA testing, "we will not require the State to pay for DNA testing where there is no showing that it would significantly aid the defense." *Coleman*, 697 So. 2d at 782. The trial court conducted extensive hearings on these matters before denying Rubenstein's requests. We find that on both issues, Rubenstein fails to demonstrate that DNA sampling would benefit his case.

*Exhumation of the bodies*

64

¶203. Rubenstein wanted the bodies exhumed to collect fingernail scrapings for DNA tests. He reasoned that at least one of the victims had defensive wounds, and a DNA analysis of fingernail scrapings could exclude him as the assailant.[22] The record reflects the trial court addressed this issue numerous times prior to both trials. Indeed, the trial court's ruling before the first trial that the bodies should not be exhumed primarily relied on the lack of probability of success in the DNA testing. The trial court considered four experts' opinions, the state of decomposition before burial, the burial in a water-logged Louisiana cemetery, and the passage of six years since the burials. This information led the trial court to find there was a lack of proof that DNA was recoverable from the bodies. While the trial court cited trial delay as part of its reasoning, that was merely a secondary ground for denying the exhumations.

¶204. Rubenstein again filed a motion to exhume the bodies before the second trial, and the trial court denied this motion as well. The trial court referenced its prior ruling that, based on scientific evidence, the probability of finding DNA was remote. Also, the trial court believed Rubenstein merely wanted to delay the trial. Finally, the trial court pointed out that the motion was filed late.[23]

¶205. We find the trial court denied the exhumations based upon the lack of probability of DNA and, to a lesser extent, the delay in the request and delay to the trial. The findings in the

---

[22] Prior to the second trial, the trial court denied Rubenstein's motion to exhume the bodies based, in part, on the delay exhumation would cause. Therefore, in his motion before the second trial, Rubenstein waived his constitutional right to a speedy trial.

[23] Rubenstein notes that his counsel was attempting to withdraw prior to the second trial and did not file anything for a period of time pending the outcome.

first trial concerning the probability of retrieving DNA justified denying the motions. *See* *Coleman*, 697 So.2d at 782. Therefore, the issue is without merit.

*Hair follicles near Krystal's body*

¶206. Rubenstein argues the trial court erred in denying the testing of hairs found near Krystal's body. Rubenstein argues that if DNA from the hairs did not match his or Krystal's DNA, then it would prove someone else was in the cabin, which might influence the jury.

¶207. The State responds by pointing out that, prior to the first trial, crime lab services were offered, but no requests were made for testing. Some testing was performed on the hairs prior to the second trial. The limited results revealed that, of the twenty-three hairs found near Krystal's body, thirteen were Caucasian head hairs, and the other hairs were also Caucasian but from an unknown part of the body. Except for one hair and one fragment, all of the head hairs had the same microscopic characteristics as Krystal's hair. The remaining hair was determined to be a chemically tinted, reddish brown color.

¶208. Notably, Rubenstein fails to mention in his brief that an agreed stipulation concerning the hairs was read to the jury by the trial court. The stipulation stated, "State of Mississippi hereby stipulates, and the defendant hereby stipulates, that the hairs found on or under the body of the victim, Crystal Perry, are not those of Alan Michael Rubenstein. And that the State of Mississippi does not know who the hairs belong to." The defense used this information in its opening statement when it argued that no physical evidence linked Rubenstein to the murders. Also, the defense previewed the stipulation in opening argument, noting, "the State agreed and admitted these hairs do not belong to Alan Michael Rubenstein and that they do not know who they belong to, proving Mike Rubenstein's innocence."

¶209. Rubenstein disingenuously claims that the lack of testing was critical to his defense, but he used the stipulation to his advantage and claimed it proved his innocence. Further, the trial court found the stipulation accomplished the same end as a DNA test - determining the hairs did not belong to Rubenstein. Under the facts of this case, Rubenstein fails to show a substantial need for the DNA testing he requested at trial. Thus, the issue is meritless.

### XXII. Whether the trial court erred in refusing to allow Rubenstein's attorneys to withdraw before the second trial.

¶210. Rubenstein next argues the trial court erred in refusing to allow his attorneys to withdraw before the second trial. Rubenstein retained Louisiana attorney James Shields, Sr., to represent him following his extradition to Mississippi. Shields appeared on a pro hac vice basis with local counsel Leigh Triche Janous, a member of Shield's law firm who was licensed in Mississippi.

¶211. Following the eleven-day trial that resulted in a mistrial, Shields moved to withdraw from the case because he had not been paid. Shields made his announcement to the trial court when the 11-1 vote to convict was revealed, and the trial court instructed Shields to make a written motion. The State asserts that during the first trial, Shields and Janous represented to the trial court that they were handling the case pro bono. The State's response to defense counsel, contained in the record, provides that Rubenstein furnished an affidavit stating he entered into a contingency contract to pay Shields $75,000 if he obtained an acquittal.[24] Rubenstein informed the trial court that he was satisfied with his attorneys, and he asked the court not to appoint anyone else.

---

[24] The affidavit is not in the court record, nor is Shields's written motion to withdraw.

¶212. On December 23, 1999, Shields and Janous filed a motion for court appointed status. An order setting the second trial for January 25, 2000, was executed on December 30, 1999. On January 7, 2000, Janous filed a motion to withdraw as counsel because she had accepted new employment with the Department of Human Services ("DHS") handling child support cases. Janous represented to the trial court that she would be responsible for the prosecution and/or *quasi*-prosecution of cases, and that Rubenstein was fearful of a conflict and the possibility of undue influence on Janous by the State. Shields also filed a motion on behalf of Rubenstein to have Janous recused.

¶213. The trial court heard the motions to withdraw and denied them, finding no evidence of a conflict. First, the trial court stated that Rubenstein had conveyed his desire to retain the same attorneys in an affidavit filed with the court. Additionally, the trial court expressed incredulity that "the representation of welfare receiving clients in the Delta in Chancery court [would] conflict[] with the representation of Mr. Rubenstein in the Circuit Court of Pike County." The trial court further determined the motions were merely an attempt to delay the second trial that was set for January 25, 2000. The trial court concluded that "it would be a travesty of justice to require somebody else to come in and pick upon [sic] this case."

¶214. On January 13, 2000, the trial court granted the motion requesting Shields and Janous be appointed Rubenstein's attorneys. The order stated, in part:

> That the Court finds that [Shields] and [Janous] were previously given the opportunity to withdraw as counsel because of the absence of present payment and declined to do so and continued to represent Mr. Rubenstein honorably and effectively; and . . . the Court finds that [Shields] and [Janous] should be appointed to represent Mr. Rubenstein.

¶215. In *Taylor v. State*, 435 So. 2d 701, 703 (Miss. 1983), this Court held, "the trial court has discretion in considering a motion of an attorney to be discharged." Additionally, "certain restraints must be put on the reassignment of counsel lest the right be 'manipulated so as to obstruct the orderly procedure in the courts or to interfere with the fair administration of justice.'" *Id.* (quoting *United States v. Bentvena*, 319 F.2d 916, 936 (2d Cir. 1963)).

¶216. Here, the record does not reflect the trial court erred in denying the motions to withdraw. The trial court heard the motions and made a detailed finding that no conflict existed. The trial court also determined the motions were pretextual and designed to delay the trial date. We find this assignment of error is without merit.

> **XXIII.**      **Whether the trial court properly instructed the jury on the burden of proof at the guilt phase of the trial.**

¶217. Rubenstein argues a number of refused jury instructions should have been given because the State's evidence was circumstantial. Rubenstein relies upon the lack of eyewitnesses to the crime scene; testimony about an unknown van parked outside his cabin; a witness who testified she saw one of the victims on December 2, 1993; and his experts who believed the time of death was two weeks, not one month, prior to finding the bodies.

¶218. Rubenstein relies upon *Jones v. State*, 797 So. 2d 922, 928-29 (Miss. 2001), for authority that a defendant must receive a two-theory instruction if the State relies on circumstantial evidence for a conviction. The proposed instructions at issue are D-19, D-20, D-24, D-27, and handwritten instruction 1.

¶219. Proposed instruction D-19 states:

> The Court instructs the jury that if there be a fact of [sic] circumstance in this case susceptible of two interpretations, one favorable and the other unfavorable

69

to the Accused, and when the jury has considered such fact or circumstances with all the other evidence, if there is a reasonable doubt as to the correct interpretation, they must resolve such doubt in favor of the Accused and place upon such fact of [sic] circumstance the interpretation favorable of the Accused.

¶220.  Proposed instruction D-20 states:

The Court instructs the jury that a person charged with a crime is presumed to be totally innocent. A person is not required to prove himself innocent, or to put on any evidence at all upon the subject. In considering the charges against Alan Michael Rubenstein in this case, you must consider the testimony and evidence in the light of that presumption, guaranteed to Alan Michael Rubenstein under the Constitution of the United States, that he is totally innocent. It is a presumption that abides with Alan Michael Rubenstein throughout the trial, and unless the evidence convinces you to the contrary beyond a reasonable doubt and to the exclusion of every reasonable hypothesis consistent with innocence, it is your sworn duty to find Alan Michael Rubenstein not guilty.

¶221.  Proposed instruction D-24 states:

The Court instructs the Jury that the circumstan[t]ial evidence used by the prosecution in this case to maintain its theory of Alan Michael Rubenstein must be so strong, in every part and parcel, as to establish guilt beyond a reasonable doubt but must also be so strong as to exclude every other reasonable hypothesis or supposition, except that of guilt.

¶222.  Proposed instruction D-27 states:

The Court instructs the Jury that if the prosecution has resorted to any degree, to the use of circumstantial evidence for the prosecution and every part and parcel of it not only must be so strong as to establish guilt beyond a reasonable doubt, but must also exclude every other reasonable hypothesis consistent with his innocence.

¶223.  Proposed handwritten instruction 1 states:

[The] Court instructs the jury that if there be any fact or circumstances in this case susceptible of [two] interpretations, one favorable [and] the other unfavorable to the [defendant], [and] is a reasonable doubt as to the correct interpretation, they  must resolve such doubt in favor of the [defendant] and place upon such fact or circumstance the interpretation favorable to the [defendant].

70

¶224. This Court's standard of review for jury instruction issues is well-established. "When considering a challenge to a jury instruction on appeal, we do not review jury instructions in isolation; rather, we read them as a whole to determine if the jury was properly instructed." *Scott*, 878 So. 2d at 966. "In determining whether error lies in the granting or refusal of various instructions, the instructions actually given must be read as a whole. When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found." *Coleman*, 697 So. 2d at 782 (quoting *Collins v. State*, 691 So. 2d 918 (Miss. 1997)). There is no error "if all instructions taken as a whole fairly, but not necessarily perfectly, announce the applicable rules of law . . . ." *Scott*, 878 So. 2d at 966 (citing *Milano v. State*, 790 So. 2d 179, 184 (Miss. 2001).

¶225. With respect to jury instructions involving the issue of circumstantial evidence, "[where] all the evidence tending to prove the guilt of the defendant is circumstantial, the trial court must grant a jury instruction that every reasonable hypothesis other than that of guilt must be excluded in order to convict." *Givens v. State*, 618 So. 2d 1313, 1318 (Miss. 1993). "A circumstantial evidence instruction must be given only when the prosecution can produce neither an eyewitness nor a confession/statement by the defendant." *Ladner v. State*, 584 So. 2d 743, 750 (Miss. 1991). "Direct evidence may also consist of a confession by the defendant, including the defendant's admission to a person other than a law enforcement officer." *Manning*, 735 So. 2d at 338 (citing *Ladner*, 584 So. 2d at 750). Finally, "an admission by the defendant on a significant element of the offense . . . operate[s] to render unnecessary the circumstantial evidence instruction." *Manning*, 735 So. 2d at 338.

¶226. In the second trial, the trial court readopted its findings on the instructions from the first trial. At the first trial, the trial court determined the State's case was not completely circumstantial. Handwritten instruction 1 was submitted during the second trial, and the trial court refused the instruction, finding it was covered by other instructions.

¶227. Rubenstein argues the statements of Ballinger should not count as direct evidence because he was a jailhouse informant. Rubenstein contends the State's case is almost entirely circumstantial, and the "so-called 'direct' evidence is obviously false."

¶228. The State provides numerous examples to demonstrate its case was not completely circumstantial. Much of the evidence at trial was direct evidence in the form of confessions and admissions by Rubenstein to other people. *See **Manning***, 735 So. 2d at 338.

¶229. Ballinger stated that while in a Louisiana jail awaiting extradition, Rubenstein told him that he was wanted for shooting his wife, his daughter, and his daughter's boyfriend. Ballinger also testified that Rubenstein said he shot his wife for being a "bitch" and having drinking problems, his daughter for running around with black men and their drugs, and he gave no reason for killing the boyfriend. Rubenstein also told Ballinger the crime happened five years ago. As it turned out, these facts were incorrect; nevertheless, Ballinger testified only as to what Rubenstein told him.

¶230. Stevens, an inmate housed in Pike County with Rubenstein in 1999, also testified:

> At that time [Rubenstein] told me that he had planned to hire somebody to kill his stepson, daughter-in-law and the granddaughter. He changed his mind. He was coming to his camp in Summit about two weeks before Thanksgiving. He went there, he killed his stepson, his daughter-in-law with a knife. He did not specifically say how he killed his granddaughter, it was strangulation, choked, or suffocation. And that after he left, he went to the Jackson's house. These were neighbors of his. He asked if they saw them. They told him- I forgot what

72

he said they told him. He left there, went back to New Orleans to wait. Nobody ever found the bodies.

Later on in December he went back. The bodies were still there, same places. His granddaughter was on the bed nude. His stepson, the eyes were gone, there were maggots on him. And his daughter-in-law was laying where she was at. She had a hole in her stomach the size that you could put our fist in.

Rubenstein also told Stevens about the insurance policy on Krystal.

¶231. A Pike County jailer, Phelps escorted Rubenstein to the restroom during trial. Rubenstein asked Phelps's opinion of Stevens's testimony and whether he thought it damaged his case. Then Rubenstein said, "I told him [Stevens] what went on up there at Summit, but I didn't know he was going to turn it into a confession." At this point, Phelps informed the prosecution of the conversation.

¶232. Further, Rubenstein told numerous people how the victims died prior to the autopsy reports. This is significant because the bodies were severely decomposed, and the cause of death was not initially clear to officials.

¶233. We find there was sufficient direct evidence to render the proposed circumstantial instructions unwarranted. This issue is without merit.

### XXIV. Whether the trial court erred in excluding double hearsay during Officer Donald Lindley's testimony.[25]

---

[25] Rubenstein argues an equal protection violation based on the trial court's decision to sustain the State's hearsay objection to Officer Lindley's testimony. Rubenstein did not raise a contemporaneous objection that the defense was receiving disparate treatment. He makes no valid equal protection argument. As discussed in the previous issues, the defense either failed to contemporaneously object to any alleged hearsay or the trial court properly allowed the testimony as a hearsay exception. Therefore, since the defense has not established any improper hearsay or favorable treatment of the State by the trial court, this argument does not merit further discussion.

¶234. Investigator Donald Lindley ("Officer Lindley") was employed by the Pike County Sheriff's Department from the early 1990's until April of 1998. The defense questioned Officer Lindley about his role in the investigation of the murders, including his interview of Dora Fales. The State objected on hearsay grounds to the officer's testimony regarding what Fales told him. The trial court allowed the questioning so long as it related to the actions taken by Officer Lindley in his investigation and not to the substance of Fales's comments. When the defense asked Officer Lindley what Fales said to him, the trial court sustained the State's objection as to hearsay. The trial court, outside the jury's presence, heard the proffered testimony of Officer Lindley. He testified that Fales said Page told her that he had seen Darrell in Mississippi around Thanksgiving. The trial court then again sustained the State's objection. After further discussion outside the presence of the jury, the trial court stated the testimony was unnecessary to explain the officer's actions; rather, the defense was trying to submit what Fales told the officer "for the truth of what was said." The trial court affirmed its ruling to sustain the objection.

¶235. Rubenstein argues the trial court erred in refusing Officer Lindley's testimony. The only authority cited by Rubenstein to support the admission of the double hearsay is *Chambers v. Mississippi*, 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973). Chambers was charged and tried for the murder of a police officer. *Id.* at 286-87. Gabe McDonald allegedly confessed to various individuals that he shot the officer. *Id.* McDonald's confession was transcribed, and he was placed in jail. *Id.* At his preliminary hearing, McDonald reputiated his prior sworn confession. *Id.* at 288.

74

¶236. Chambers sought to treat McDonald as an adverse witness in questioning him about his prior confession to the crime Chambers was charged with committing. *Id.* at 291. Chambers also sought to use hearsay testimony of three witnesses who would have testified that McDonald had confessed to them that he shot the officer. *Id.* at 287-90. The trial court rejected both attempts. *Id.* The United States Supreme Court held that exclusion of the critical evidence and failure to permit Chambers to cross-examine McDonald "denied him a trial in accordance with traditional and fundamental standards of due process." *Id.* at 302. The Court limited its holding in to "the facts and circumstances of this case." *Id.* at 303.

¶237. The facts here are readily distinguishable from those in *Chambers.* Rubenstein attempted to introduce the double hearsay of Fales telling Officer Lindley what Page told her. In this case, Page actually testified, and the defense had ample opportunity to cross-examine him about seeing Darrell around Thanksgiving. Additionally, the trial court did not prevent Rubenstein from questioning Page on this issue, so whether or not Page saw Darrell did not have to come in through hearsay from Officer Lindley. Finally, Page never confessed to murdering the family. Therefore, this case is dramatically different from *Chambers*, which was limited to the facts and circumstances of that case. Rubenstein fails to demonstrate the trial court erred in denying the hearsay testimony. This issue is without merit.

**XXV. Whether the jury instructions on the sentencing options in this case were proper.**

¶238. Rubenstein argues the trial court erred in denying proposed jury instructions D-1, D-3, and D-10, all of which included the sentencing option of life imprisonment without parole.

The trial court refused the instructions for failure to give an accurate statement of the sentencing options or repeating information presented in accepted instructions.

¶239. This Court has repeatedly held that "jury instructions are within the sound discretion of the trial court." **Goodin v. State**, 787 So. 2d 639, 657 (Miss. 2001). When jury instructions are challenged on appeal, we do not review them in isolation; rather, "we read them as a whole to determine if the jury was properly instructed." **Milano**, 790 So. 2d at 184.

¶240. The following instructions are relevant to this assignment of error.[26] Proposed instruction D-1, which was refused, provides:

> The Court instructs the Jury that if you see fit, whether mitigating circumstances exist or not, you may recommend mercy for the Defendant and sentence him to **imprisonment for the rest of his natural life**. This recommendation is solely in your discretion and not controlled by any rule of law. You may make such recommendation with or without a reason.

¶241. Instruction D-8, as given, states:

> The Court instructs the Jury that, whether mitigating circumstances exist or not, you may recommend mercy for the defendant and sentence him to **life imprisonment**. This recommendation is solely in your discretion and not controlled by any rule of law. You may make such recommendation with or without a reason.

¶242. The trial court also gave instruction D-7, which states, in part, "Mitigating circumstances are those circumstances that tend to justify the penalty of **life imprisonment** as opposed to death."

¶243. The trial court refused instructions D-3 and D-10. Proposed instruction D-3 provides:

> The Court instructs the Jury that a decision to afford an individual defendant mercy and thereby sentence him to **life imprisonment without possibility of**

---

[26] The emphasis in the quoted jury instructions has been added.

**parole or probation** or to life imprisonment with the possibility of parole would not violate the laws if this State or your oath as jurors. Even if you find there are no mitigating circumstances in this case which are worthy of your consideration, then, nevertheless, you still may sentence defendant [sic] to **life imprisonment without possibility of probation** or parole or life imprisonment with the possibility of parole.[27]

¶244. Proposed instruction D-10 states:

If you sentence defendant to **life imprisonment without possibility of probation or parole**, defendant will never be eligible for parole or probation. If you sentence defendant to death, he will be executed by lethal injection.

¶245. In lieu of proposed instructions D-3 and D-10, the trial court gave instruction D-6:

The Court instructs the Jury that it is now your duty to determine what punishment must be imposed upon Alan M. Rubenstein. You must determine which of the following punishments is appropriate to impose on Alan M. Rubenstein **(1) Life imprisonment or (2) Death by lethal injection**.

¶246. The instructions given by the trial court provided the jury with only two sentencing options: life imprisonment or death by lethal injection. Rubenstein argues he was entitled to have the jury instructed that it had a third option, that is, life without possibility of parole. The State contends Rubenstein is procedurally barred from asserting this error on appeal because he never objected to the trial court's ruling that the option of life without parole was inapplicable to his case, and that this Court should "reconsider the holding in [*Watts v. State*, 733 So. 2d 214, 237 (Miss. 1999)] to the extent that case relaxed the procedural bar as to this issue."

¶247. Rubenstein tendered jury instructions which clearly attempted to instruct the jury that it had the option of sentencing him to life without possibility of parole. The trial court

---

[27] Our disposition of this issue on the basis of the incorrect sentencing options in no way reflects our support of the presentation of a mercy instruction to the jury. See ***Thorson v. State***, 895 So. 2d 85, 108 (Miss. 2004); ***Hansen v. State***, 592 So. 2d 114, 150 (Miss. 1991).

77

rejected these instructions and failed to fashion any instruction which properly instructed the jury of its three options. It is well settled that "the refusal of instructions offered by the defendant need not be objected to in order to preserve the issue for appeal." *Green v. State*, 884 So. 2d 733, 736 (Miss. 2004). An error concerning the refusal of jury instructions "is procedurally preserved by the mere tendering of the instructions, suggesting that they are correct and asking the Court to submit them to the jury." *Edwards*, 737 So. 2d at 310. "When the instructions are refused, there is no reason why we should thereafter require an objection to the refusal unless we are to place a value upon redundancy and nonsense." *Carmichael v. Agur Realty Co.*, 574 So. 2d 603, 613 (Miss. 1990).

¶248. In *Duplantis v. State*, 708 So. 2d 1327, 1339 (Miss. 1998), the defendant claimed the trial court erred in refusing his proposed jury instructions. The State argued Duplantis was procedurally barred from presenting the error on appeal because he did not object to the denial of his proffered instructions at the trial court level. *Id.* We disagreed, stating, "[a]lthough in *dicta* [in *Nicholson ex rel. Gollott v. State*, 672 So. 2d 744, 752 (Miss. 1996)] we indicated that we could impose a procedural bar, we did not intend to overrule existing caselaw and therefore require litigants to object to the denial of instructions they themselves have offered." *Duplantis*, 708 So. 2d at 1339. The defendant "only needed to tender his suggested jury instruction in order to preserve review." *Id.* at 1340.

¶249. Based on our well-established precedent, Rubenstein sufficiently preserved this assignment of error for appellate review when he tendered sentencing instructions including the life without parole option. Requiring a party to object to the refusal of its own jury

instructions would be illogical and oppressive, and we hold that Rubenstein is not procedurally barred from raising this issue. Accordingly, we will now address the merits of the argument.

¶250. Several statutes are relevant to this discussion. Miss. Code Ann. Section 97-3-21 provides:

> Every person who shall be convicted of murder shall be sentenced by the court to imprisonment for life in the State Penitentiary.

> Every person who shall be convicted of capital murder **shall** be sentenced (a) to death; (b) **to imprisonment for life in the State Penitentiary without parole**; or (c) to imprisonment for life in the State Penitentiary with eligibility for parole as provided in Section 47-7-3(1)(f).

Miss. Code Ann. § 97-3-21 (1994) (emphasis added). Prior to the enactment of the 1994 amendment, the capital murder sentencing scheme provided only two sentencing options: life imprisonment or death.

¶251. Section 47-7-3(1)(f), which provides the conditions for eligibility for parole, states: "No person shall be eligible for parole who is charged, tried, convicted and sentenced to life imprisonment under the provisions of Section 99-19-101." Miss. Code Ann. § 47-7-3 (1994).

¶252. Section 99-19-101(1), concerning the jury's role in capital murder sentencing proceedings, provides, in part:

> Upon conviction or adjudication of guilt of a defendant of capital murder or other capital offense, the court shall conduct a separate sentencing proceeding to determine whether the defendant should be sentenced to death, **life imprisonment without eligibility for parole**, or life imprisonment.

Miss. Code Ann. § 99-19-101 (1994) (emphasis added).

¶253. Finally, Section 99-19-1 states:

> No statutory change of any law affecting a crime or its punishment or the collection of a penalty shall affect or defeat the prosecution of any crime

79

committed prior to its enactment, or the collection of any penalty, whether such prosecution be instituted before or after such enactment; and all laws defining a crime or prescribing its punishment, or for the imposition of penalties, shall be continued in operation for the purpose of providing punishment for crimes committed under them, and for collection of such penalties, notwithstanding amendatory or repealing statutes, **unless otherwise specially provided in such statutes**.

Miss. Code Ann. § 99-19-1 (1994) (emphasis added).

¶254. Also significant to this discussion is the following language from the amending act for Section 97-3-21, the capital murder penalty statute quoted above, which states, "[t]he provisions of this act shall apply to any case in which pre-trial, trial or resentencing proceedings take place after July 1, 1994." 1994 Miss. Laws ch. 566, § 5.

¶255. Although Rubenstein committed the crimes in 1992, his trial did not commence until January 2000. The trial court determined the sentencing option of life without parole was inapplicable to Rubenstein because "this case falls within the gap between the two laws." Thus, the trial court incorrectly concluded the amended statute did not apply to Rubenstein. We previously addressed the appropriate application of the amended penalty statute in *West v. State*, 725 So. 2d 872 (Miss. 1998).

¶256. In *West*, the defendant was indicted on March 23, 1993, for the December 1992 murder of a store clerk. *Id.* at 876-77. The trial began on August 8, 1994, and the jury found West guilty of capital murder. *Id.* at 877. West argued the amended penalty statute (Section 97-3-21 quoted *supra*) applied to his case, and he repeatedly submitted jury instructions including the life without parole sentencing option. *Id.* The trial court refused them all and held that, because West was indicted, arraigned, and his trial set before the amendment's enactment, he

80

would be sentenced under the previous sentencing statute. *Id.* Given the choices of death or life with the opportunity for parole, the jury sentenced West to death. *Id.*

¶257. This Court acknowledged that prior to the amendment, "defendants who were convicted of capital murder could only be sentenced to either death or life with the possibility of parole." *Id.* However, we specifically noted the amending act stated, "'[t]he provisions of this act shall apply to any case in which **pre-trial, trial or resentencing** proceedings take place **after July 1, 1994**.'" *West*, 725 So. 2d at 877 (quoting 1994 Miss. Laws ch. 566 § 5) (emphasis added). Because West's trial began on August 8, 1994 - after the July 1, 1994, effective date - the plain language in Section 97-3-21 required the trial court to instruct West's sentencing jury on the sentencing options of life, life without parole, or death. *West*, 725 So. 2d at 877.

¶258. We clarified any potential confusion with Section 99-19-1 by explaining:

> Section 99-19-1 provides that all laws prescribing punishment will continue to govern the penalties of all crimes committed under them, notwithstanding amendatory or repealing statutes, **unless otherwise especially provided in such statutes**. The amendment to § 97-3-21 especially provides that it is to apply to crimes that were committed before its effective date. Thus, the proscriptions of § 99-19-1 do not preclude the application of the amendments to West.

*Id.* at 788-89 (emphasis in original). Because Section 97-3-21 "clearly and lawfully directed capital defendants whose pre-trial, trial or resentencing proceedings take place after July 1, 1994 to have their sentencing juries given the option of life without parole in addition to life with the possibility of parole and death," we held that the trial court committed reversible error in refusing to give West's jury the life without parole option. *Id.* at 882. This Court vacated West's death sentence and remanded the case for resentencing. *Id.*

81

¶259. In *Watts*, 733 So. 2d at 237, the trial court determined that since the crimes occurred in December 1993, before the amended penalty statute was enacted, the jury would be strictly instructed in the sentencing phase that it had two options - life imprisonment or death - and parole could not factor into their deliberation. This Court criticized the trial court's position and held that because Watts's trial occurred in August 1995, Section 97-3-21, as amended, should have been applied. *Id.* Furthermore, correcting the trial court's error was of such paramount importance that this Court disregarded a procedural bar to the issue. *Id.* We held, "[p]rocedural bar notwithstanding, Sentencing Instruction No. 2 erroneously instructed the jury that it had only two sentencing options: life in prison or the death penalty. A third option, life imprisonment without the possibility of parole, should have been presented pursuant to Miss. Code Ann. §§ 97-3-21 and 99-19-101." *Id.* Accordingly, we reversed and remanded the case for resentencing. *Id.*

¶260. Rubenstein was convicted of capital murder after enactment of the amendment. The trial court here, like the trial courts in *West* and *Watts*, was required to instruct the jury as to the option of life without parole as provided in the amended statute.

¶261. We also addressed the issue of sentencing options in *Flowers v. State*, 842 So. 2d 531 (Miss. 2003). In *Flowers*, the jury received sentencing instructions with the two possibilities of death or life imprisonment **without** parole. *Id.* at 556. Reading the relevant statutes in concert, this Court found, "a defendant on trial for capital murder may only be sentenced to death or life imprisonment without the eligibility of parole. According to § 47-7-3(1)(f), there is no longer the possibility of life imprisonment." *Id.* at 557. Although the trial court only

82

gave the options of death and life without parole, it "properly instructed the jury on the appropriate sentencing options." *Id.* at 558.

¶262. Under *West*, *Watts*, and *Flowers*, we are required to find in today's case that the trial court's exclusion of life without parole in the sentencing instructions was erroneous. Omitting the option of life **with** the possibility of parole would not have been prejudicial to the defendant, and we would have found no error. *See Flowers*, 842 So.2d at 558. However, the trial court in this case eliminated the option of life without possibility of parole. It is reasonable to conclude that many jurors, unsure about imposing death but resolved that the defendant should never be allowed out of jail, would opt for "death" rather than simply "life imprisonment" with the possibility of parole. Discussions between the jury venire and the trial court in *Wiley v. State*, 691 So. 2d 959 (Miss. 1997), demonstrate this disturbing reality.

¶263. *Wiley* was decided under the prior capital murder sentencing scheme where the only two sentencing options were death and life imprisonment. *Id.* at 963. While the case may not illuminate the substantive issues of the instant case, it does illustrate the potential thinking of jurors faced with sentencing a person to die or, perhaps worse in their minds, someday seeing that person walking the streets free.[28] During the general voir dire of the jury venire, the following exchange took place:

> Juror: Is this life with no parole or do they - will there be an opportunity for this jury to distinguish no parole as opposed to the death penalty?

---

[28] The "Juror" statements come from different members of the jury pool. We have not individually identified the speakers because our focus is the substance of the comments, not which potential juror said what.

Court:    The law says life in prison. The courts or the juries have absolutely nothing to do with parole laws. . . . [I]f the jury sentences him to life, we don't know whether it's life with or without [parole] because that's up to the executive department.

* * *

Juror:    **So he could get out after 20 years?**

Court:    I think the jury is just going to have to . . . take this and weigh it and make your decision based upon the way you see the evidence, not upon some uncertainty unknown down the road which you have no control over and I have no control over and just call it the way you see it at the conclusion of the trial.

* * *

Juror:    If the jury decides - does not unanimously decide for the death penalty and life imprisonment is the decision, who - when is - when is it justified - when would it ever be decided that it would definitely be life without parole? I was under the impression that decision could be made in lieu of the death penalty. And what I'm understanding you to say is that the death penalty is not the choice - **there is a possibility that he would be given life imprisonment with parole as a possibility.** Is that what you're saying?

Court:    That's a possibility, yes.

Juror:    But no jury has the right to say that it's life without parole?

Court:    The current status of the law is . . . if you prescribe death, that's your decision; if you prescribe life in prison, that's your decision.

* * *

Juror:    Is that like a hole in the law? . . .**[I]f I look at this case and see that I think this man would be a menace to society for the rest of his life and I don't vote for the death penalty but life imprisonment, I would be inclined more to vote for the death penalty because I don't know if he's going to get out.**

* * *

Juror:    **So even if we vote for life imprisonment, we're not guaranteed life in prison.**

Court:    No ma'am. You'll be doing exactly what the law says. That's what the law says. If there's parole down the road somewhere, I don't have any control of it.

* * *

Juror:    In other words, what you're saying, Your Honor, is that if given the choice of life imprisonment or the death penalty, **if the jury went with life in prison, the defendant could get out tomorrow, he could be paroled tomorrow technically?**

Court:    Well, not tomorrow.

Juror:          Well, as soon as the trial is over, as soon as he goes back to jail?

Court:          Well, at some point in time, possibly yes, I don't know.

*Wiley*, 691 at 962-63 (emphasis added). The jury later sentenced Wiley to death. *Id.* at 960.

¶264. We include the above exchanges to demonstrate the importance of including the middle-ground option of life without the possibility of parole in capital murder sentencing instructions. As one juror noted, "I would be inclined more to vote for the death penalty because I don't know if he's going to get out." *Id.* at 963. While the trial court in *Wiley* did appropriately present the only two sentencing options applicable at the time of that trial - life imprisonment and death - the same cannot be said in this case.

¶265. *West* provides a more concrete example of the significance of the "life without parole" instruction. During West's original sentencing, the trial court presented the jury with two options - death or life with the possibility of parole - and the jury returned a sentence of death. *West*, 725 So.2d at 877. We vacated West's sentence and remanded the case for resentencing based on the trial court's failure to give the option of life without parole. *Id.* at 882. On remand, West was instead sentenced to life without parole. *West v. State*, 820 So. 2d 668, 669 (Miss. 2001).

¶266. The State argues this Court should create a requirement that any defendant charged with a capital murder that occurred prior to the enactment of the 1994 statutory amendment must "(a) voice a contemporaneous objection to the absence of an instruction on the option of life without parole, and/or (b) clearly request a legally correct instruction as to the option of life without parole." In making this request, the State seems to forget that our duty is to interpret the laws as enacted by the Legislature, not to make up our own additional demands at the behest

of one party. The Legislature determined that a person convicted of capital murder whose trial begins after July 1, 1994, **shall** receive sentencing instructions that include the option of life without parole. Our precedent has respected this requirement, and we will continue to demand its application.

¶267. If there is any statute that demands strict application, it is the sentencing statute for death penalty cases. We find the trial court's failure to include the statutorily required sentencing option of life without the possibility of parole constitutes reversible error.

**XXVI.     Whether the trial court properly instructed the jury with regard to sympathy.**

¶268. Rubenstein argues the trial court erred by instructing the jury that it could not consider sympathy. Instruction C-1 provides, in pertinent part:

> It is your duty to determine the facts and to determine them from the evidence produced in open court. You are to apply the law to the facts and in this way decide the case. You should not be influenced by bias, sympathy or prejudice. Your verdict should be based on the evidence and not upon speculation, guesswork or conjecture.

¶269. Rubenstein failed to raise a contemporaneous objection to this instruction, so the issue is procedurally barred. *Williams*, 684 So.2d at 1203. Additionally, this assignment of error is likewise without merit. Rubenstein's argument has been repeatedly rejected by this Court.

¶270. The trial court never instructed the jury to completely disregard sympathy in toto in violation of the Eighth Amendment. *King v. State*, 784 So. 2d 884, 899 (Miss. 2001). The trial court merely stated the jury "should not be influenced by bias, sympathy or prejudice." Further, this language has already survived scrutiny by this Court. *See Scott*, 878 So. 2d at 981-82; *Holland*, 705 So. 2d at 351, *Blue v. State*, 674 So. 2d 1184, 1225 (Miss. 1996);

*Ladner*, 584 So. 2d at 759. Accordingly, we find that the trial court did not err in giving these instructions, and this issue is without merit.

XXVII. **Whether there is cumulative error.**

¶271. Rubenstein argues the cumulative effect of the errors in his trial warrant reversal. In *Wilburn v. State*, 608 So. 2d 702, 705 (Miss. 1992), this Court held that "individual errors, not reversible in themselves, may combine with other errors to make up reversible error." The question that must be asked in these instances is whether the defendant was deprived of a "fundamentally fair and impartial trial" as a result of the cumulative effect of all the errors at trial. *Id.* In *Byrom*, 863 So. 2d at 847, also a death penalty case, we stated:

> What we wish to clarify here today is that upon appellate review of cases in which we find harmless error or any error which is not specifically found to be reversible in and of itself, we shall have the discretion to determine, on a case-by-case basis, as to whether such error or errors, although not reversible when standing alone, may when considered cumulatively require reversal because of the resulting cumulative prejudicial effect.

¶272. None of the issues raised by Rubenstein with respect to the guilt phase of his trial rise to the level of reversible error, either standing alone or when considered together. The guilty verdicts find substantial support in the evidence, and Rubenstein fails to demonstrate any corresponding procedural or substantive errors that warrant reversal. There is no cumulative error, and thus no need to reverse his convictions. Because we did find reversible error as to the inaccurate sentencing instructions, we need not address Rubenstein's cumulative error argument concerning the sentencing proceedings.

**CONCLUSION**

¶273. For these reasons, we affirm the judgment of the Pike County Circuit Court as to Rubenstein's convictions and to the life sentences for the two murder convictions. However, based on the failure of the trial court to instruct the jury that it had the option to sentence Rubenstein to life without possibility of parole, we reverse and remand this case for resentencing on the capital murder charge in accordance with this opinion.

¶274. **COUNT I: CONVICTION OF CAPITAL MURDER IS AFFIRMED. SENTENCE OF DEATH IS REVERSED AND REMANDED FOR RESENTENCING CONSISTENT WITH THIS OPINION. COUNT II: CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS TOGETHER WITH PAYMENT OF A FINE OF $10,000.00, ALL OTHER COSTS AND COURT COSTS, AFFIRMED. COUNT III: CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. SENTENCES IN COUNTS II AND III SHALL RUN CONSECUTIVELY WITH EACH OTHER.**

**WALLER AND COBB, P.JJ., DIAZ, CARLSON AND GRAVES, JJ., CONCUR. EASLEY, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY SMITH, C.J., AND RANDOLPH, J.**

**EASLEY, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶275. While I concur with the majority's affirmance of Rubenstein's convictions for the capital murder of Krystal and the murders of Darryl and Annie and the life sentences for the two murders, I must respectfully dissent as to the majority's reversal of Rubenstein's death penalty sentence and remand to the trial court for resentencing. In my opinion, the majority erroneously finds reversible error with the trial judge's handling of the jury instructions in this case. I disagree and find that the trial judge, the Honorable Keith Starrett, properly instructed the jury. As I would affirm Rubenstein's death penalty sentence, I am compelled to write in

order to specifically address Issue XXV of the majority opinion and address facts in the record that are crucial to the case.

¶276. This case involves the especially gruesome murder of a four-year-old girl and the brutal murder of her parents by the child's grandfather in order to profit from a $250,000 life insurance policy that he maintained on the four-year-old child. The horrible circumstances and events that surround the order in which the three died is unsettling. The evidence demonstrates that the child was the last to die. The child's body was found naked, spread eagled with maggots in her vagina, and in a state of extreme decomposition. The maggots prevented a positive determination of whether the child had been sexually molested.

¶277. On December 16, 1993, Annie, her husband, Darrell, and their four-year-old daughter, Krystal, were found murdered in a cabin in Summit, Mississippi. Darrell's stepfather, Rubenstein, owned the cabin. Rubenstein used the cabin as a weekend home. On November 5 or 6, 1993, Rubenstein drove Annie, Darrell, and Krystal from New Orleans, Louisiana, to the cabin in Mississippi. Rubenstein was the one who "discovered" the bodies and contacted the sheriff's office as to the grisly "discovery."

¶278. C.V. Glynnis was the Sheriff of Pike County, Mississippi, at the time the three bodies were discovered on December 16, 1993. When Sheriff Glynnis arrived at the scene, he saw two adult bodies in the living room and a child's body in the bedroom. All three people were dead. According to Sheriff Glynnis, the victims had plainly been dead for some time based on the decomposition of the bodies.

89

¶279. Sheriff Glynnis recovered information from the medical examiner, Dr. Ward, which indicated that the victims were either stabbed to death or strangled to death. Annie was stabbed eight times. Darrell had a number of stab wounds as well.

¶280. Glen Allen Applewhite, the criminal investigator for the Mississippi Highway Patrol on December 16, 1993, worked the scene. He testified that the little girl, Krystal, was discovered dead and her body laid on the bed completely naked. During the course of his investigation, Officer Applewhite went to the residence of Zula Loque, Annie's mother. Loque told him that Darrell and Annie were completely dependant on Rubenstein for food, money, and transportation.

¶281. James Stevens testified that while he was an inmate at the Pike County Jail he knew Rubenstein. Stevens testified that Rubenstein told him that he killed his family for the money. Rubenstein told him that at the time he had insurance policies out on both of his granddaughters. Stevens testified that he recalled the insurance policy being for about $200,000. According to Stevens, Rubenstein told him that he planned for it to look like a drug deal. Stevens stated that Rubenstein told him he planted two kilos of cocaine around the scene of the camp, but the cocaine was never found.

¶282. George Hiene, an insurance agent, who sold health and life insurance for New York Life in Metarie, Louisiana, testified that the application date for Krystal's insurance policy was September 13, 1991, when she was two years old. Rubenstein also had life insurance on his other grandchild, Brittany, David's daughter. The first premium payment was by check from Rubenstein's account. Hiene was contacted between ten days to two weeks after Krystal's death concerning a claim for the proceeds. The earliest date a claim was made on the policy

90

was January 26, 1994. Doris, Rubenstein's wife and Darrell's mother, assigned $60,000 of the proceeds of the insurance policy to Rubenstein's attorney, Wiely J. Beavers as a retainer. Doris signed the death claim on January 26 with Rubenstein present. The insurance check was issued on April 13, 1994, to Doris. Doris received disbursements of $200,275.85 on April 13. The other $60,000 was issued to Doris and Attorney Beavers. Doris requested that Brittany's policy be canceled on November 22, 1995. Doris took affirmative steps to cancel the policy, and it was not just a mere lapse in premium payments. Doris also canceled her own policy in June 1995. A second policy on Brittany was affirmatively canceled by Doris earlier in the year in September 1995. In Hienes' twenty four years as an agent, he never had a life insurance policy for $250,000 taken out on a two year old child.[29]

¶283. Dr. Steven Hayne, a forensic pathologist, testified as to the cause and manner of death of the victims. Annie was determined to have died of multiple stab wounds. There were eight stab wounds in the chest area, two of which were lethal wounds to the left lung. Annie's body had no evidence of defensive wounds. The cause of death was multiple stab wounds.

¶284. As for Darrell, his body was also in an advanced state of decomposition like Annie's. His body had numerous stab wounds and slash wounds. There was a slash wound across Darrell's neck which measured about seven inches. The slash was very deep, and to the point that bone was visible on the autopsy. There was one slash wound and two wounds to Darrell's arms and these wounds indicated defensive posturing. In addition, there were four stab wounds

---

[29] There was testimony at trial that Rubenstein had previously been denied the proceeds as the beneficiary to his business partner's life insurance policy. Rubenstein's business partner died in a hunting accident when they were hunting. The denial of the life insurance policy was the result of the policy not being in effect for two years. Krystal's death came shortly after the two year anniversary of the policy being taken out on Krystal.

which were lethal. Two of these stab wounds were to the chest and the other two wounds were to the abdomen and consequently, internal organs. Darrell's death was due to the stab wounds to the trunk of his body, the chest, abdomen and wounds to the lung, liver and heart. Darrell's stab wounds were considerably deeper than the wounds received by Annie. The shortest stab wound on Darrell was two and a half inches which is twice as deep as any wound on Annie's body. Darrell's defensive wounds indicate a struggle took place.

¶285. The autopsy report showed that Krystal had suffered a hemorrhage to the neck area. The cause of death for Krystal was determined to be strangulation. Dr. Hayne testified that the death occurred weeks to months before they were discovered. In response to the State's question on whether Krystal's death was painful and the length of time it took for her to die, Dr. Hayne stated:

| | |
|---|---|
| Hayne: | With considerable pressure on the side of the neck, there would be compression of the major vessels of the side of the neck, both the right and the left sides, to include the carotid arteries and the jugular veins. With compression of those structures, blood flow to the brain would cease and unconsciousness would intervene in a period of a few seconds to a few tens of seconds. If complete occlusion occurs, it's estimated any where from approximately four seconds to fifteen seconds from unconsciousness would occur. |
| | Certainly during that time frame, or even longer, if compression were not complete initially, there would be pain and suffering from compression of those structures of the neck, not only light headedness, but certainly air starving and the like. |
| State: | During that period of time, would the child have experienced panic? |
| Hayne: | Yes, sir. |
| State: | Terror? |
| Hayne: | Yes, sir. |

¶286. The State's expert, Dr. William Bass, a forensic anthropologist, testified that in the crime scene pictures it was difficult to see the maggot masses because maggots are attracted to blood and moist areas of the body, i.e., eyes, nose, mouth, ears vagina, anus, or any wound on the body. He stated that the decomposition of the bodies, putrification, bloating, hair and skin slippage, leaching of fatty acids, and mummification, indicated that "there was decay there before the maggots got there." Furthermore, Dr. Bass discussed the existence of existence of pupa casings based on testimony from other witnesses.

¶287. Officer Applewhite, testified that there were "the remains of maggots where they had hatched. Sounded like Rice [C]rispies when we were walking through the house." Coroner, Percy H. Pittman, Jr., testified that there was a crackling sound as they walked through the crime scene, like "Rice Crispies or something to that effect." Moreover, the State submitted that certain photographs in composite Exhibit 47 indicate - even to the untrained eye - that there were pupa casings in Krystal's hair. Neither Dr. Bass nor any of the experts that testified were able to pinpoint an exact time of death.

¶288. Rubenstein argues that the trial court erred by denying proposed jury instructions D-1, D-3 and D-10. The trial court refused the instructions as failing to state accurately the sentencing options. The trial court also determined that proposed instruction D-1 was "covered in D-8" which was given.

¶289. Jury instructions are within the sound discretion of the trial court. *Goodin v. State,* 787 So. 2d 639 (Miss. 2001). This Court has repeatedly held that jury instructions are to view as a whole. *See Smith v. State,* 835 So. 2d 927, 937 (Miss. 2002) ("Jury instructions are to be read together and taken as a whole with no one jury instruction taken out of content"); *Milano*

***v. State,*** 790 So. 2d 179, 184 (Miss. 2001) ("When considering a challenge to a jury instruction on appeal, we do not review jury instructions in isolation; rather, we read them as a whole to determine if the jury was properly instructed").

¶290. Proposed instruction D-1, which was refused, provided:

> The Court instructs the Jury that if you see fit, whether mitigating circumstances exist or not, you may recommend mercy for the Defendant and sentence him to imprisonment for the rest of his natural life. This recommendation is solely in your discretion and not controlled by any rule of law. You may make such recommendation with or without a reason.

¶291. Instruction D-8, as given, provided:

> The Court instructs the Jury that, whether mitigating circumstances exist or not, you may recommend mercy for the defendant and sentence him to life imprisonment. This recommendation is solely in your discretion and not controlled by any rule of law. You may make such recommendation with or without a reason.

¶292. The trial court also gave instruction D-7:

> A mitigating circumstances is any fact relating to defendant's character or history, or any aspect of the crime itself, which may be considered extenuating or reducing the moral culpability of the killing or making the defendant less deserving of the extreme punishment of death. In offering mitigating circumstances, the defendant is not suggesting that the crime is justifiable or excusable. Mitigating circumstances are those circumstances that tend to justify the penalty of life imprisonment as opposed to death.

¶293. The trial court refused instructions D-3 and D-10. Proposed instruction D-3 provides:

> The Court instructs the Jury that a decision to afford an individual defendant mercy and thereby sentence him to life imprisonment without possibility of parole or probation or to life imprisonment with the possibility of parole would not violate the laws if this State or your oath as jurors. Even if you find there are no mitigating circumstances in this case which are worthy of your consideration, then, nevertheless, you still may sentence defendant [sic] to life imprisonment without possibility of probation or parole or life imprisonment with the possibility of parole.

94

¶294. Proposed instruction D-10 states:

> If you sentence defendant to life imprisonment without possibility of probation or parole, defendant will never be eligible for parole or probation.
>
> If you sentence defendant to death, he will be executed by lethal injection.

¶295. Both proposed instructions D-3 and D-10 incorrectly state the sentencing options. Part of proposed instruction D-3, regarding mitigating circumstances is covered in instruction D-7. The mercy language in proposed instruction D-3 is also covered by instruction D-8. However, proposed instruction D-3 provides no sentencing option of death. Therefore, it is not an accurate or proper instruction.

¶296. The trial court was also not required to give proposed instruction D-10 providing the meaning of life without parole. In *Flowers v. State,* 842 So. 2d 531, 556-58 (Miss. 2003), this Court held that the trial court was not required to inform the jury of the meaning of life without parole. The Court stated:

> This Court has repeatedly held that except in habitual offender cases, where a life sentence would automatically mean life without parole, the parole issue should not be considered by the sentencing jury. *Smith v. State*, 724 So. 2d 280, 293-94 (Miss. 1998); *Blue v. State*, 674 So. 2d 1184, 1194-96 (Miss. 1996); *Mackbee v. State*, 575 So. 2d 16, 40-41 (Miss. 1990); *Williams v. State*, 544 So. 2d 782, 798 (Miss. 1987); *Cabello v. State*, 471 So. 2d 332, 346 (Miss. 1985). In this state's original case on this issue, *Williams v. State*, 445 So. 2d 798, 812-14 (Miss. 1984), this Court held that:
>
> > A jury should have no concern with the quantum of punishment because it subverts a proper determination of the sentencing issue.
> > Reference to the possibility of parole should the defendant not be sentenced to die are wholly out of place at the sentencing phase of a capital murder trial for two additional reasons.
> > First, such references inevitably have the effect of inviting the jury to second guess the Legislature. The Legislature has declared that persons sentenced to life imprisonment may under certain

95

circumstances become eligible for parole. Miss. Code Ann. § 47-7-3(1). It is no more proper for the jury to concern itself with the wisdom of that legislative determination than it is for the jury to consider the Legislature's judgment that death in the gas chamber be an authorized punishment for capital murder. ***Johnson v. State***, 416 So. 2d 383, 392 (Miss. 1982).

Second, parole is not automatic. No person sentenced to life imprisonment has any "right" to parole. ***Greenholtz v. Inmates of Nebraska Penal and Correctional Complex***, 442 U.S. 1, 11, 99 S. Ct. 2100, 2105, 60 L. Ed. 2d 668, 677 (1979); ***Davis v. State***, 429 So. 2d 262, 263 (Miss. 1983). Allowing argument or testimony regarding the possibility of the defendant some day being paroled is in effect inviting the jury to speculate how ten years in the future the parole board may exercise its legislatively granted discretionary authority. This would introduce into the sentencing proceedings an "arbitrary factor" proscribed by section 99-19-105(3)(a).

***Williams***, 445 So. 2d at 813 (emphasis in original). This Court has reaffirmed this holding on several occasions. *See* ***Smith v. State***, 724 So. 2d 280, 293-94 (Miss. 1998); ***Blue v. State***, 674 So. 2d 1184, 1194-96 (Miss. 1996); ***Mackbee v. State***, 575 So. 2d 16, 40-41 (Miss. 1990); ***Williams v. State***, 544 So. 2d 782, 798 (Miss. 1987); ***Cabello v. State***, 471 So. 2d 332, 346 (Miss. 1985).

842 So. 2d at 557.

¶297.   Besides instruction D-8, the jury was given instruction D-6 which provides:

The Court instructs the Jury that it is now your duty to determine what punishment must be imposed upon Alan M. Rubenstein. You must determine which of the following punishments is appropriate to impose on Alan M. Rubenstein (1) Life imprisonment or (2) Death by lethal injection.

Rubenstein argues that he should have received an instruction that provided the jury the option of sentencing him to life without parole.

¶298.    The statutes relevant to this discussion are Miss. Code Ann. § § 97-3-21 (1994), 47-7-3 (1994), and 99-19-1.    Miss. Code Ann. § 97-3-21(1994), the penalty for murder or capital murder, provides:

> Every person who shall be convicted of murder shall be sentenced by the court to imprisonment for life in the State Penitentiary.
>
> Every person who shall be convicted of capital murder shall be sentenced (a) to death; (b) to imprisonment for life in the State Penitentiary without parole; or (c) to imprisonment for life in the State Penitentiary with eligibility for parole as provided in Section 47-7-3(1)(f).

Miss. Code Ann. § 47-7-3 (1994) provides the conditions for eligibility for parole.    Miss. Code Ann. § 47-7-3(1)(f) states:

> No person shall be eligible for parole who is charged, tried, convicted and sentenced to life imprisonment under the provisions of Section 99-19-101.

¶299.    Miss. Code Ann. § 99-19-101 is the separate death penalty statute to determine the punishment in capital cases.    Miss. Code Ann. § 99-19-101, provides the aggravating and mitigating circumstances to be considered and the separate sentencing proceedings to be held. Here, Miss. Code Ann. § 99-19-101 is applicable as Rubenstein was sentenced to death for the capital murder of Krystal.

¶300.    Further, Miss. Code Ann. § 99-19-1 provides:

> No statutory change of any law affecting a crime or its punishment or the collection of a penalty shall affect or defeat the prosecution of any crime committed prior to its enactment, or the collection of any penalty, whether such prosecution be instituted before or after such enactment; and all laws defining a crime or prescribing its punishment, or for the imposition of penalties, shall be continued in operation for the purpose of providing punishment for crimes committed under them, and for collection of such penalties, notwithstanding amendatory or repealing statutes, unless otherwise specially provided in such statutes.

¶301. The State contends that Rubenstein's assignment of error is procedurally barred as Rubenstein raised no contemporaneous objection to the trial court's judgment that the option of life without parole was inapplicable because "this case falls within the gap between the two laws." Likewise, the State asserts that the defense "never presented the option of life without parole to the trial court in a legally correct instruction and/or objected to the absence of the life without parole option in the instructions that were given." *See **Williams,*** 684 So. 2d at 1203 (contemporaneous objection applies in death penalty cases); *but see **Watts v. State,*** 733 So. 2d 214, 236-37 (Miss. 1999).

¶302. The majority concludes that Rubenstein did not need to make an objection because the defense offered a jury instruction which was refused by the trial court. The majority relies upon ***Green v. State***, 884 So. 2d 733, 736 (Miss. 2004), and that reliance is correct to a point. In ***Green***, the defendant offered a lesser non-included jury instruction which was refused by the trial court. ***Id***. The Court stated that the refused jury instruction was clearly a lesser non-included instruction. ***Id***. The Court stated that there was no need for Green to object in order to preserve the issue for appellate review because the instruction was offered. ***Id***. **However, the Court in *Green* was not faced with the question of whether the instruction was a proper statement of the law as we have here.** The Court addressed whether sufficient evidence existed in the record in order to determine *whether the proper lesser non-included instruction* should have been allowed. ***Id***. at 738. Finding that the evidence was sufficient to allow the instruction, this Court reversed the trial court's refusal to give the instruction. ***Id***.

98

¶303. However, the majority errs in stating that Rubenstein attempted to put forth his position as to the sentencing option in the jury instructions that were refused. Had Rubenstein actually offered a jury instruction that contained a proper statement of the law, then there would be no need to review the procedural bar waiver created in *Watts*. Here, Rubenstein did not offer a jury instruction that was a proper statement of the law. Despite no proper jury instruction being offered, Rubenstein also did not object to the refusal of the defense's jury instruction. None of the jury instructions offered by Rubenstein contained death as a sentencing option.

¶304. The State asks this Court to reconsider our holding in *Watts,* 733 So. 2d at 237, and the procedural bar waiver that it created. In *Watts*, former Presiding Justice Chuck McRae, then Justice McRae, authored the opinion that removed the procedural bar, stating:

> Watts next complains that the circuit court's instructions to the jury during both the guilt and sentencing phases of his trial were constitutionally deficient. *The assignments of error are barred because of Watts' failure to object to the complained of instructions at trial or even raise them in his motion for a new trial. Berry v. State,* 703 So. 2d 269, 277 (Miss. 1997). Moreover, he fails to cite any authority or provide any meaningful argument in support of most of the objections he now raises to many of the instructions. *Brown,* 690 So. 2d at 297; *McClain,* 625 So. 2d at 781; *Baine,* 604 So. 2d at 255.
>
> *Procedural bar notwithstanding*, sentencing Instruction No. 2 erroneously instructed the jury that it had only two sentencing options: life in prison or the death penalty. A third option, life imprisonment without the possibility of parole, should have been presented pursuant to Miss. Code Ann. § § 97-3-21 and 99-19-101. Watts, therefore, is entitled to re-sentencing proceedings.

*Watts,* 733 So. 2d at 236-37. (Emphasis added). No authority was provided in support of the removal of the procedural bar. *Id*. In fact, by the use of the language, "*procedural bar notwithstanding,*" the opinion acknowledged that a procedural bar applied. *Id*. Accordingly,

bad law was created by this Court without providing any foundational legal authority to justify the decision to remove the procedural bar.

¶305. The State argues that "at a minimum, the defendant who is charged with a capital murder that occurred prior to the enactment of the 1994 statutory amendment should be required to: (a) voice a contemporaneous objection to the absence of an instruction on the option of life without parole, and/or (b) clearly request a legally correct instruction as to the option of life without parole."

¶306. In *Watts,* the Court found that the assignments of error were procedurally barred because of Watts's failure to object to the complained of instructions at trial. However, the Court found reversible error, procedural bar notwithstanding. *Watts* created an erroneous decision that contradicts this Court's well-established principle that a contemporaneous objection must be made to the trial court, even in death penalty cases. *See Williams,* 684 So. 2d at 1203. As the State contends, Rubenstein is now procedurally barred on appeal. Rubenstein raised no contemporaneous objection at trial nor offered a legally correct instruction to the trial court. Accordingly, the procedural bar should be applied.

¶307. Rubenstein also argues that this case is indistinguishable from *West v. State,* 725 So. 2d 872 (Miss. 1998). *West* involved the application of Miss. Code Ann. § 97-3-21 to require an instruction that the jury could sentence a defendant to life imprisonment without parole. *Id.* at 877. The Court in *West* held that the amendment to Miss. Code Ann. § 97-3-21 applied to any case in which pretrial, trial or re-sentencing proceedings take place after July 1, 1994. *Id.* at 877-78. In *West,* the trial court denied West's numerous requests for the instruction in a

bench ruling to instruct the jury to consider all three sentencing options. *Id.* at 877. West shot and killed Azra Garriga Kiker on December 16, 1992. *Id.* at 876. West was indicted for Kiker's murder on March 23, 1993. *Id.* West was convicted and sentenced in August, 1994. *Id.* The Court determined that the trial court erred in not instructing jury that West could be sentenced to life without parole. *Id*. at 876. The Court considered that *West*:

> [R]epeatedly requested that the court apply these amendments as his case, and accordingly instruct the jury that they could consider both death and life without parole: in a pre-trial motion, in several suggested jury instructions which were refused by the court, and on the record in several discussions with the judge directly. At one point, the court asked West directly whether he wanted to be tried and sentenced under the new statute, to which he responded affirmatively.

*Id.* at 877. The Court further stated:

> After half an hour of deliberation, the jury sent out a note asking whether West would be eligible for parole if it gave him a life sentence. After the judge replied that he would not give the jury any further elaboration on the meaning of a life sentence, it deliberated for almost two more hours before returning a sentence of death.

*Id.* at 880.

¶308. Here, the murders of Darrell, Annie, and Krystal occurred in 1993. Rubenstein was indicted on September 15, 1998. Rubenstein's second trial commenced on January 25, 2000. The defense voiced no objection during discussion of the jury instructions or asked the trial to instruct the jury on life without parole. Proposed instruction D-3, stated "you . . . may sentence defendant [sic] to life imprisonment without possibility of probation or parole or life imprisonment with possibility of parole." However, the instruction does not include the option of death as a sentencing option. Therefore, a proper instruction was not offered by the defense. Furthermore, the jury did not request any further elaboration from the trial court as to the

101

meaning of life as was the case in the rationale provided in *West*. Therefore, this case is clearly distinguishable from *West.*

¶309. Furthermore, the majority disregards the State's position that a defendant charged with capital murder for crimes committed prior to the 1994 statutory amendment should (1) make a contemporaneous objection when there is an absence of a life without parole instruction, or (2) request a legally correct instruction for the option of life without parole. The basis for the majority's unwillingness to adopt the State's position is the necessity of strict application of the statutes. However, the majority in this case does not take a strict application approach when actually applying the statutes. The majority states that "[i]t is reasonable to conclude that many jurors, unsure about imposing death but resolved that the defendant should never be allowed out of jail, would opt for 'death' rather than simply 'life imprisonment' with the possibility of parole." Maj. op. ¶ 262.

¶310. The majority interjects an analysis of the juror's thought process, which is not contained in the statutory language found in Miss. Code Ann. §§ 97-3-21 (1994), 47-7-3 (1994), or 99-19-1, in determining whether the death penalty was appropriate here. The majority also cites to a lengthy excerpt from *Wiley v. State*, 691 So. 2d 959 (Miss. 1997), in which a juror, during voir dire, questioned the trial court concerning the meaning of life imprisonment. However, *Wiley* is clearly distinguishable from this case. Here, no juror questioned the trial court about the meaning of life imprisonment. There is absolutely nothing in the record to indicate what a particular juror was "thinking" at the time the sentence was imposed. To accept the majority's position, we must engage in pure speculation on our part as to what the jury was thinking when the sentence of death was imposed. Likewise, the jury

102

was polled as to the conviction and sentence, and all jurors stated that the verdict was unanimous.

¶311. Rubenstein makes the same erroneous argument as the majority, however, he relies upon *West* rather than *Wiley*. In *West*, as discussed previously above, the jurors sent a note the trial judge after half an hour of deliberating asking whether West would be eligible for parole with a life sentence. *West*, 880 So. 2d at 880. This Court in *West* held:

> Although the State discourages this Court from inferring any conclusion that the jury would have given West life without parole had it been able to do so, the jury's question indicates at the least its contemplation of West's eligibility for parole. It requires no intellectual strain to conclude that the jury may well have sentenced West to life without parole, had it been instructed that such a sentence was possible.

*Id*. However, these two cases are fundamentally different from the case today. Unlike the jurors in *Wiley* and *West*, the jurors seated in the Rubentstein case never asked the trial court any questions concerning the meaning of a life sentence nor sent any note requesting information as to the meaning of life.

¶312. The statutes at issue do not set a standard for this Court to determine what a juror might consider when deliberating. As previously noted above in *Williams*, 445 So. 2d at 812-14, this Court held that jurors should have no concern with the magnitude of a punishment as it undermines the sentencing issue. If a defendant is not sentenced to death at the sentencing phase of a capital murder trial, then the jury should not consider the possibility of parole because it allows the jury to second guess the Legislature. *Id*. Likewise, the jury should not consider the Legislature's wisdom in allowing parole in certain circumstances pursuant to Miss. Code Ann. § 47-7-3(1) or the wisdom to allow death as punishment for capital murder

103

cases. *Id*. Therefore, a juror should not consider the wisdom behind the Legislature's actions. However, the majority is not strictly applying the statutes in this case. By inserting language not contained in the statutes regarding an alleged fear that the confused jurors would choose to sentence Rubenstein to death rather than sentence him to life, and thus face the possibility of parole, the majority fails to strictly apply the statutes.

¶313. Without conceding this point, assuming arguendo that this Court does consider the thought process of a juror, it is just as likely, if we are going to guess, that the jurors could have determined that the imposition of death was the proper sentence and sentenced Rubenstein accordingly. This is especially true in the case of a gruesome murder for profit of an innocent four-year-old girl and her parents. The jury clearly found Rubenstein guilty and convicted him accordingly. The facts demonstrate that Krystal was brutally strangled and left to rot for weeks in a cabin in Mississippi for life insurance money. Krystal had a close relationship with Rubenstein. Rubenstein also raised Krystal's father Darrell from a young age. Nevertheless, as the jury determined, Rubenstein murdered Krystal, Darrell, and Annie. When Rubenstein grew tired of waiting for someone else to find the three murdered in order to collect the insurance proceeds, he went to the cabin and "discovered" the bodies. The evidence reflects that both parents were murdered as collateral damage in order to have access to Krystal to murder her. Krystal's body was found rotting, infested with maggots, nude, and spread-eagle. The medical examiner testified that during the strangulation Krystal would have felt pain, suffering, fear, and panic.

¶314. The month after the bodies were discovered, Rubenstein accompanied his wife to collect the insurance proceeds. Ultimately, Rubenstein used the money to pay his legal fees

104

and "blew" the rest on his mistress in Texas. Clearly, it is just as likely that the jurors meant to impose the death penalty in this case. However, the applicable statutes before this Court today, contain no such language that allows this Court to look into the mind of a juror.

¶315. For the foregoing reasons, I conclude that Judge Starrett did not err in refusing the improper jury instructions. I would affirm the trial court's judgment in its entirety.

**SMITH, C.J., AND RANDOLPH, J., JOIN THIS OPINION.**